**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| LIFESIZE, INC., | Case No. 23-50038 (DRJ) |
| Debtors.[1] | (Jointly Administered) |

## DEBTORS' WITNESS AND EXHIBIT LIST

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby submit the following *Witness and Exhibit List* (the "Witness and Exhibit List") with respect to the hearing scheduled to be held on June 6, 2023 at 1:00 p.m. (prevailing Central Time) (the "Hearing") in the above-captioned bankruptcy cases (the "Cases"), pending before the Honorable David R. Jones, United States Bankruptcy Judge.

## WITNESS LIST

The Debtors may call the following witnesses:

1.  Marc Bilbao, Co-Chief Restructuring Officer.

2.  James Kang, Piper Sandler & Co.

3.  Any witness listed, offered, or called by any other party.

4.  Any witness required for rebuttal or impeachment.

5.  The Debtors reserve the right to cross-examine any witness called by any other party.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Lifesize, Inc. (5803); SL Midco 1, LLC (6980); SL Midco 2, LLC (9192); Serenova, LLC (9208); Telstrat, LLC (5255); LO Platform Midco, Inc. (5738); Serenova WFM, Inc. (2823); and Light Blue Optics, Inc. (7669). The Debtors' service address is 216 West Village Blvd., Suite 102, Laredo, TX 78041.

## EXHIBIT LIST

| Exhibit No. | Description | Mark | Offer | Object | Admit | W/D | Disposition After Hearing |
|---|---|---|---|---|---|---|---|
| 1. | Declaration of Marc Bilbao in Support of Debtors' Chapter 11 Petitions and First Day Relief [Docket 13] | | | | | | |
| 2. | Declaration of James Kang in Support of Emergency Motion of Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Obtain Post-Petition Financing [Docket 5] | | | | | | |
| 3. | DIP Budget [to be filed] | | | | | | |
| 4. | Any exhibits listed, designated, or offered by any other party. | | | | | | |
| 5. | Any exhibits necessary for rebuttal. | | | | | | |
| 6. | Any pleading or other document filed with the Court on the docket of the above-captioned chapter 11 cases and related adversary proceedings. | | | | | | |

## RESERVATION OF RIGHTS

The Debtors reserve the right to modify, amend or supplement this Witness and Exhibit List at any time.  The Debtors reserve the right to ask the Court to take judicial notice of pleadings, orders, transcripts and/or documents filed in or in connection with these Cases, to offer rebuttal exhibits, and to supplement or amend this Witness and Exhibit List at any time prior to the Hearing.  Designation of any exhibit above does not waive any objections the Debtors may have to any exhibit listed on any other party's exhibit list.

[*Remainder of Page Intentionally Left Blank*]

DOCS_LA:349330.1 52624/001

Dated: June 2, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Benjamin L. Wallen*
Benjamin L. Wallen (TX Bar No. 24102623)
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile: (713) 691-9407
bwallen@pszjlaw.com

-and-

Jeffrey N. Pomerantz (Admitted *pro hac vice*)
Jordan A. Kroop (Admitted *pro hac vice*)
Cia H. Mackle (Admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
jpomerantz@pszjlaw.com
jkroop@pszjlaw.com
cmackle@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 2nd day of June, 2023, a true and correct copy of the above and foregoing has been served on all parties that are registered to receive electronic transmission through this Court's CM/ECF filing system in these cases.

*/s/ Benjamin L. Wallen*
Benjamin L. Wallen

# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| LIFESIZE, INC., | Case No. 23-50038 (DRJ) |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF MARC BILBAO IN SUPPORT
## OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Marc Bilbao, pursuant to section 1726 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Co-Chief Restructuring Officer (the "Co-CRO") of Lifesize, Inc. ("Lifesize") and its affiliates (the "Company") and a senior managing director of FTI Consulting, Inc. ("FTI"). Prior to being named Co-CRO of the Company on April 11, 2023, I led FTI's engagement as the Company's financial advisor since FTI was engaged by the Company in early March 2023.

2.      FTI is a leading advisory firm that delivers a broad range of interrelated strategic, operational and financial advisory services. Specifically, FTI's services include, among others, assessments of an organization's financial and operational condition, performance management and improvement, interim and crisis management, restructuring and turnaround consulting, merger and acquisition services, and advisory and guidance through the bankruptcy process. FTI has

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Lifesize, Inc. (5803); SL Midco 1, LLC (6980), SL Midco 2, LLC (9192); Serenova, LLC (9208); Telstrat, LLC (5255); LO Platform Midco, Inc. (5738); Serenova WFM, Inc. (2823); and Light Blue Optics, Inc. (7669). The Debtors' service address is 216 W. Village Blvd., Laredo, TX 78041.

2350003823051600000000000015

provided chief restructuring officer and financial advisory services in large and complex Chapter 11 cases in this District and throughout the country.

3.      I have 25 years of professional experience as restructuring advisor, investment banker, and financial advisor, among other roles, to companies during both out-of-court and chapter 11 proceedings throughout the United States. I have a B.S. in Business Administration from Seattle University and I am a Chartered Financial Analyst.

4.      On the date hereof (the "<u>Petition Date</u>"), the above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") each commenced a voluntary case (collectively, the "<u>Chapter 11 Cases</u>") under chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>"), and they will continue to operate their business and manage their properties as debtors in possession.

5.      I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records, and the Company's restructuring efforts. Except as otherwise indicated herein, the facts set forth in this declaration (this "<u>Declaration</u>") are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of or advisors to the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6.      To minimize any adverse effects of filing the bankruptcy petitions (the "<u>Petitions</u>") and to preserve value for the benefit of all stakeholders, the Debtors have filed a number of motions requesting various forms of "first day" relief (collectively, the "<u>First Day Pleadings</u>"). I submit, and am authorized by the Debtors to submit, this Declaration in support of the Petitions and the

First Day Pleadings. The relief requested in the First Day Pleadings is necessary to preserve and maximize the value of the Debtors' estates and allow them to sustain their current operations in chapter 11.

## PRELIMINARY STATEMENT

7.     The Debtors' have filed these Chapter 11 Cases principally to implement a sale of substantially all their assets to Enghouse Systems Ltd. or another purchaser offering the highest and best terms for such a sale. The Debtors' senior secured lender, First-Citizens Bank & Trust Company (successor by purchase to the Federal Deposit Insurance Corporation as Receiver for Silicon Valley Bridge Bank, N.A. (as successor to Silicon Valley Bank)) ("SVB"), has agreed to provide up to $5 million in new senior secured debtor-in-possession financing (described more fully below) to fund the Chapter 11 process to solicit competing bids for, and complete a going-concern sale of, substantially all the Debtors' assets.

8.     This Declaration is intended to provide a summary overview of the Debtors' businesses, the circumstances leading to the commencement of these Chapter 11 Cases, and in support of the relief the Debtors seek in the First Day Pleadings. I have organized this Declaration as follows:

- **Part I** provides a general overview of the Company's corporate history and business operations.

- **Part II** describes the Company's prepetition corporate and capital structure.

- **Part III** describes the circumstances leading to the commencement of these Chapter 11 Cases.

- **Part IV** sets forth the evidentiary basis for the relief requested in each of the First Day Pleadings.

# I.

## THE COMPANY'S HISTORY AND BUSINESS OPERATIONS

9.      Debtor Lifesize, Inc. was founded in 2003 under the name KMV Technologies in Austin, Texas, bringing to market the world's first high-definition video conferencing system. Two years later, Lifesize debuted another first, a business-class high-definition video conferencing solution, Lifesize Room, integrating its software platform driven by enterprise-level audio-visual hardware. From 2007–10, Lifesize grew rapidly, introducing several new video conferencing systems, obtaining a leadership position in the video conferencing segment, and successfully raising several rounds of equity financing to fund future growth. Logitech International, S.A. acquired Lifesize in 2009 and divested its majority equity ownership in 2015, retaining an equity position through the Petition Date.

10.     By 2014, Lifesize had introduced a cloud-based video conferencing service that moved the company's platform away from legacy hardware systems toward a platform flexible enough to be used on smartphone mobile devices. The company's conference-room hardware offerings continued to evolve with additional innovations introducing 4K video conferencing and full-motion content sharing in 4K by 2018, as well as high-quality recording capabilities for multi-party video calls. In early 2020, Lifesize's parent, SL Midco 2, acquired ownership of Serenova, bringing omnichannel contact center software solutions (CCaaS), customers, and employees to the combined offering.

11.     As of the Petition Date, Lifesize is based in Laredo, Texas, maintaining a corporate office located at 216 W. Village Blvd., Laredo, TX 78041 and bank accounts containing company funds at a PNC Bank branch also in Laredo. Lifesize conducts two lines of business—CCaaS (contact center software as a service) and VCaaS (video conferencing software as a service).

12.     CCaaS comprises: (a) the company's CxEngage Platform, which offers the mid-size enterprise a unified contact center solution with a video-enabled omnichannel and workforce engagement suite; (b) Classic platform, the company's historical contact center platform still being used by several customers; (c) TelStrat, a call recording and workforce optimization solution for contact centers providing call and screen recording, live monitoring, and agent quality management functionality; and (d) ProScheduler, a workforce management software platform used in contact centers providing forecasting and schedule optimization to enhance workforce productivity. CCaaS software is sold both directly and through global channel partners.

13.     VCaaS comprises: (a) Lifesize's end-user cloud-based video conferencing software solution that individuals can access through a mobile-phone app, online portal, or meeting room device to make video calls; (b) Lifesize's hardware package for meeting room- and auditorium-based 4K video conferencing, which comprises conference room hardware, an ongoing warranty, and a subscription to Lifesize's cloud; and (c) Kaptivo, a combined hardware and software package that digitizes, saves, and shares live physical whiteboard content. VCaaS software and hardware are sold both directly and through global channel partners.

14.     As of the Petition Date, the Debtors employ approximately 67 employees, all of whom are Lifesize employees, including both salaried and hourly employees. The Debtors' workforce also includes approximately 72 independent contractors. The Debtors also fund the payroll of approximately 32 employees of non-Debtor foreign affiliates identified below.

## II.

### THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE

**A.      Corporate Structure**

15.      The Debtors are part of a group of entities that maintains operations in the US and throughout the world, all under the umbrella of SL Midco 1, LLC, which is wholly-owned by SL Topco, LP. The following organizational chart is further described below and depicts all Lifesize affiliates, including the Debtors, which comprise only the US-based entities shown below (entities shown in blue are Delaware corporations or limited liability companies; entities shown in gray are non-Debtor, non-US entities):



16.      Unless otherwise indicated, all the following entities are Debtors. Non-debtor SL Topco, LP owns 100% of the membership interests in SL Midco 1, LLC, a Delaware limited

liability company. SL Midco 1, LLC owns 100% of the membership interests in SL Midco 2, LLC, a Delaware limited liability company. SL Midco 2, LLC owns 100% of the equity interests in Lifesize, Inc., a Delaware corporation, and LO Platform MidCo, Inc., a Delaware corporation ("**LOP MidCo**"). LOP MidCo owns 100% of the equity interests in Serenova, LLC, a Delaware limited liability company, which, in turn, owns 100% of the equity interests in Telstrat LLC, a Delaware limited liability company, Serenova WFM, Inc., a Delaware corporation, and approximately four non-Debtor, non-US entities. Lifesize owns 100% of the equity interests in Light Blue Optics, Inc., a Delaware limited liability company, and nine non-Debtor, non-US entities.

## B.     Prepetition Capital Structure

### i.   *Prepetition Secured Facilities*

17.     **First Priority First Lien Term Loan.** Debtors SL Midco 1, SL Midco 2, Serenova and Lifesize (together with Debtor LO Platform Midco, Inc. as guarantor, the "<u>Borrowing Debtors</u>") are borrowers under a *Credit Agreement* dated as of March 2, 2020 (most recently amended with the *Fifth Amendment to Credit Agreement* dated as of October 31, 2022 the "<u>First Lien Credit Agreement</u>"), under which SVB, as lender and as administrative agent and collateral agent for all lenders (*i.e.*, SVB, SVB Innovation Credit Fund VIII, L.P. ("<u>SVB Capital</u>"), and MCOF Finance, LLC ("<u>MCOF</u>")), made a term loan to the above-listed Debtors secured by a first-priority lien on substantially all the Debtors' assets (the "<u>First Priority First Lien Term Loan</u>"). As of the Petition Date, the Debtors owed approximately $4.7 million under the First Priority First Lien Term Loan, 40% of which is held by SVB, 40% of which is held by SVB Capital,[2] and 20% of which is held by MCOF.

---

[2] Following the FDIC's takeover of SVB in March 2023, First Citizens Bank & Trust Company assumed all SVB's customer deposits and acquired all SVB loans. As a result, SVB Capital is no longer affiliated with SVB.

18. **Regular Priority First Lien Term Loan & Revolver.** Also under the First Lien Credit Agreement, SVB made term and revolving loans to the Borrowing Debtors, secured by a first lien on substantially all the Debtors' assets, subordinate only to the first-priority lien granted identified above (the "Regular Priority First Lien Loan"). As of the Petition Date, the Debtors owed approximately $54 million under the Regular Priority First Lien Loan, 100% of which is held by SVB.

19. **Second Lien Term Loan.** The Borrowing Debtors are borrowers under a second *Credit Agreement* dated as of March 2, 2020 (most recently amended with the *Fourth Amendment to Credit Agreement* dated as of October 31, 2022, the "Second Lien Credit Agreement"), under which SVB Capital as administrative agent and collateral agent for the lenders thereto (including SVB Capital) made a term loan to the Borrowing Debtors secured by a second-priority lien on substantially all the Debtors' assets (the "Second Lien Term Loan"). As of the Petition Date, the Debtors owed approximately $20 million under the Second Lien Term Loan, 80% of which is held by SVB Capital and 20% of which is held by the other lenders thereto. The Debtors also maintain a senior revolver loan from SVB with borrowings as of the Petition Date of approximately $3 million.

20. **Secured Bridge Loan.** Lifesize is the borrower under a *Subordinated Secured Credit Agreement* dated as of October 31, 2022, under which lenders affiliated with the Debtors' majority equity holder (together, the "Bridge Lenders") made a term loan to Lifesize in principal amount of $4 million (the "Secured Bridge Loan") secured by a first priority lien on Lifesize's Employee Retention Credits, a refundable federal tax credit for businesses that continued to pay employees while shut down due to the COVID pandemic or had significant declines in gross

8

receipts from March 2020 to December 2021 ("ERC Proceeds"). As of the Petition Date, the Debtors owed approximately $615,000 on the Secured Bridge Loan.

ii. *Unsecured Creditors*

21.     **Unsecured Bridge Loan.** Lifesize is the borrower under a *Subordinated Unsecured Credit Agreement* dated as of November 4, 2021, under which the Bridge Lenders made a term loan to Lifesize in principal amount of up to $2 million (the "Unsecured Bridge Loan"). As of the Petition Date, the Debtors owed approximately $1.7 million on the Unsecured Bridge Loan.

22.     **Former Landlord.** Several years ago, Lifesize leased 99,000 square feet across four floors in an office building in Austin, Texas, with a Brandywine REIT known as G&I VII Barton Skyway LP. Lifesize's business changed after 2015, and it worked with the landlord to reduce the company's footprint while continuing to pay rent. In 2021, in an effort to mitigate losses associated with the extra space, Lifesize presented the landlord with what Lifesize believed was a qualified subtenant, which the landlord rejected in a manner Lifesize believes was impermissible under the lease. As its COVID-affected revenue continued to decline, Lifesize fell behind on its rent and vacated all but the first floor of the leased space to permit the landlord to ready the upper floors for re-letting. In August 2021, the landlord locked Lifesize out of the entire space and filed a lawsuit. Lifesize tried unsuccessfully for months to negotiate a settlement to remain in the premises and to pay back rent over time. Litigation between the landlord and Lifesize continues as of the Petition Date.

23.     **Seller Notes.** The Debtors are obligors under a series of *Subordinated Promissory Notes* issued on or about March 2, 2020, to the then-selling holders of the Debtors' equity interests (the "**Seller Notes**"). The Seller Notes are unsecured debt obligations totaling, as of the Petition Date, $28,225,000 in principal, exclusive of accrued interest, including approximately $8.4 million

owed to Logitech International, S.A. and $5.4 million owed to each of Meritech Capital Lifesize LLC and Redpoint Omega II, LP. The Debtors have made no debt service or other payments to the holders of the Seller Notes since the Seller Notes' issuance.

24.    **Trade Debt.** The remainder of the unsecured claims against the Debtors' estates mostly comprise payables owed to the Debtors' trade creditors. Although the Debtors continue to examine their books and records for purposes of preparing their Schedules of Assets and Liabilities, the Debtors estimate that, as of the Petition Date, trade payables and other miscellaneous unsecured claims against the Debtors' consolidated estates total approximately $26 million.

iii.  *Equity Interests*

25.    As noted above, 100% of the equity interests in Debtor SL Midco 1, LLC are owned by SL Topco, LP.[3] All other Debtors are first-, second-, third-, and fourth-level wholly-owned subsidiaries of SL Midco 1 as shown on the organizational diagram above.

C.    **Events Leading to the Chapter 11 Filings**

26.    As described above, Lifesize's core business and majority of its revenue has historically come from the VCaaS business, an office-based conference room-to-conference room video communications platform. With the onset of the global COVID pandemic beginning in March 2020, the vast majority of the company's customers and users abruptly shifted to remote work and were no longer communicating using an office-based video conference room system. When users stopped using conference rooms and, therefore, did not need Lifesize's VCaaS offerings as much, the company's VCaaS business declined abruptly and sharply.

---

[3] Logitech and some of the other larger holders of Seller Notes also retain equity interests at or above SL Topco, LP.

27.     Simultaneously, the astronomical and immediate growth in demand for remote videoconferencing solutions occasioned by the COVID pandemic allowed other players in Lifesize's industry with less focus on office-based use cases to rapidly add customers and expand their offerings in ways that significantly encroached on Lifesize's customer base. Users began turning to competitors' technology, further eroding Lifesize's revenues at precisely the most disadvantageous time.

28.     But with its global footprint serving an industry-leading customer base, its strong technology, and compelling use case, Lifesize is poised to compete effectively in a telecommunications market adjusting to new realities of hybrid and remote work for enterprises of all sizes. Lifesize's customers can access the company's unique multivendor video conferencing interoperability and proactive services in a business environment where every conference room must be a video conference room. The contact center software solutions enable customer service experiences that help improve customer resolution rates while lowering operational costs. In addition, the CxEngage contact center platform can offer embedded video customer service calls, providing a differentiated solution that allows agents to see the customer and resolve customer issues faster.

29.     The sustained declines in Lifesize's business began to strain the company's ability to service its long-term debt obligations and to remain current with many of its vendors. Cash flow challenges began to mount and, with little insight into when the economic effects of the pandemic would abate, the company engaged the investment banking firm of Piper Sandler in October 2021 to begin exploring strategic divestments of parts of the business in 2022. In February 2022, the business was able to divest a small portion of its intellectual property and employee base related to the Kaptivo product to raise $2.8 million in cash for the business. By the late summer of 2022,

Piper Sandler's process did not result in any offer the company believed would be in the best interests of the company's stakeholders to accept. The company re-engaged Piper Sandler in March 2023 to explore a strategic sale of the company's business.

30.     In October 2022, the company was able to obtain up to $4 million of additional debt financing from the Bridge Lenders to bridge the company to a longer-term restructuring. Lifesize's cash flows did not return to pre-pandemic levels, further straining the company's operations.

31.     In the 12 months preceding the Petition Date, the company has had gross revenues of approximately $63 million and unadjusted EBITDA of approximately $3 million. The company materially reduced costs by more than $50 million as the business declined during the COVID pandemic. Nonetheless, the company's disappointing performance necessitated the engagement, in March 2023, of Piper Sandler as investment banker to explore a near-term going-concern sale of substantially all the company's assets. Enghouse Interactive, Inc. emerged from that marketing process as a potential purchaser offering the most advantageous terms for such a sale. Because Enghouse required a sale to be implemented through a Chapter 11 process, the company negotiated debtor-in-possession financing from SVB and commenced these Chapter 11 proceedings as quickly as possible to maintain operations, protect the company's employees and customers, and preserve the value of its assets.

### III.

### FIRST DAY PLEADINGS[4]

32.     I am familiar with the contents of each First Day Pleading (including their exhibits and other attachments) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) will enable the Debtors to sustain operations while in

---

[4]   Unless otherwise noted herein, capitalized terms used in this section have the meanings ascribed to them in the applicable First Day Pleading.

chapter 11; (b) is critical to the Debtors' ability to maximize the value of their estates; and (c) serves the best interests of the Debtors' estates and creditors. Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly-tailored and necessary to achieve the goals identified above.

### ADMINISTRATIVE MOTIONS AND APPLICATIONS

**A.**   ***Debtors' <u>Emergency</u> Motion for Order Directing the Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only* (the "<u>Joint Administration Motion</u>")**

33.     Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing procedural consolidation and joint administration of their related Chapter 11 Cases. Joint administration of these Chapter 11 Cases will provide significant administrative convenience and cost savings to the Debtors without harming the substantive rights of any party in interest.

34.     Many of the motions, hearings, and orders in these Chapter 11 Cases will affect all of the Debtor entities. For example, virtually all of the relief sought by the Debtors in the First Day Pleadings is sought on behalf of each of the Debtors, as set forth in further detail in each of the First Day Pleadings. The entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration of these Chapter 11 Cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding, instead of multiple independent chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.**   ***<u>Emergency</u>* Ex Parte *Application for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC. as Claims, Noticing, and Solicitation Agent* (the "<u>Claims Agent Retention Application</u>")**

35.     Pursuant to the Claims Agent Retention Application, the Debtors seek entry of an order authorizing the Debtors to employ and retain Kurtzman Carson Consultants LLC ("<u>KCC</u>")

as claims, noticing, and solicitation agent in the Debtors' Chapter 11 Cases effective as of the Petition Date. Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of KCC to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the Debtors' estates. Moreover, it is my understanding that, based on all engagement proposals obtained and reviewed, KCC's rates are competitive and reasonable given KCC's quality of services and expertise with a case of this size.

36.      The Debtors anticipate that there will be thousands of persons and entities to be noticed in these Chapter 11 Cases. In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Claims Agent Retention Application.

**C.**      ***Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (E) Rule 2015.3 Financial Reports and (II) Granting Related Relief* (the "<u>Schedules Extension Motion</u>")**

37.      Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order: (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") by 30 days, for a total of 44 days from the Petition Date, through and including June 29, 2023; (b) extending the deadline by which the Debtors must file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Federal Rule of Bankruptcy Procedure 2015.3 (the "<u>2015.3 Reports</u>") to and including 44 days

after the Petition Date (*i.e.*, June 29, 2023), without prejudice to the Debtors' ability to request additional extensions for cause shown or to file a motion seeking a modification of such reporting requirements for cause; and (c) granting related relief.

38.     I believe there to be ample cause to grant the relief requested in the Schedules Extension Motion.  To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, leases, and contracts from each of the Debtor entities. Collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors, their employees, and their advisors at a time when such resources would be best used to stabilize the Debtors' business operations at the outset of these cases. Additionally, because this information is voluminous and located in numerous places throughout the Debtors' organization, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.

39.     Although I believe that the Debtors' management, employees, professional advisors, and key personnel have prepared diligently for these Chapter 11 Cases, preparing the Schedules and Statements was not practicable given the complex nature of the Debtors' business. Prior to the Petition Date, the Debtors focused their efforts on preparing for a smooth transition into chapter 11.  Such efforts made it difficult for the Debtors to prepare the Schedules and Statements in advance of the Petition Date.

40.     The Debtors, with the assistance of their professional advisors, have been and will continue working diligently and expeditiously to prepare the Schedules and Statements within the additional time requested.  I anticipate that the Debtors will require at least 44 days after the Petition Date to complete the Schedules and Statements.  I believe that an extension will not harm creditors or other parties in interest because, even under the extended deadline, the Debtors will

file the Schedules and Statements in advance of an applicable deadline for filing proofs of claim in these Chapter 11 Cases.  Absent the duration of the extension requested herein, the Debtors may be required to file amendments to their Schedules and Statements, which could cause undue confusion and uncertainty for parties wishing to review and rely upon the Schedules and Statements filed in these Chapter 11 Cases without commensurate benefit.

41.     Certain of the Debtors maintain interests in non-Debtor subsidiaries that may fall under the ambit of Bankruptcy Rule 2015.3 and, as such, the Debtors would be required to file 2015.3 Reports. I believe exists to extend the deadline for filing the 2015.3 Reports based on (a) the size, complexity, and scope of the Debtors' business and (b) the substantial burdens imposed by compliance with Bankruptcy Rule 2015.3 in the early days of these Chapter 11 Cases.

42.     I believe an extension of the deadline to file the initial 2015.3 Reports will enable the Debtors to work with their financial advisors and the United States Trustee for the Southern District of Texas (the "U.S. Trustee") to determine the appropriate nature and scope of the reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.

43.     I do not believe the relief requested will prejudice any party in interest. The Debtors intend to work cooperatively with the U.S. Trustee and any other necessary parties in these Chapter 11 Cases to provide access to relevant information regarding the business and financial affairs of the Debtors and the non-Debtor subsidiaries. Accordingly, the Court should grant the relief requested in the Schedules Extension Motion.

D.    ***Debtors'*** <u>***Emergency***</u> ***Motion for Entry of an Order (I) Implementing Complex Case Management and Related Hearing Procedures; (II) Authorizing the Debtors to File a Consolidated Creditor Matrix; (III) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (IV) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, (V) Waiving the Requirement to File a List of Equity Security Holders, and (VI) Granting Related Relief*** **(the "**<u>**Creditors' Matrix Motion**</u>**")**

44.    Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order: (a) implementing the *Procedures for Complex Cases in the Southern District of Texas*, dated January 1, 2023 (the "<u>Complex Case Procedures</u>") and procedures for conducting hearings in these Chapter 11 Cases; (b) authorizing the Debtors to file and maintain their list of creditors pursuant to Rule 1007(a) (the "<u>Creditor Matrix</u>") on a consolidated basis; (c) authorizing the Debtors to redact certain personally identifiable information; (d) approving the form and manner of notifying creditors of the commencement of these Chapter 11 Cases; and (e) granting related relief.

45.    Although the Debtors were not required to self-designate as "Complex Cases" under the Complex Case Procedures, the Debtors nonetheless request implementation of the Complex Case Procedures to aid in the efficient administration of these Chapter 11 Cases. With multiple debtors and numerous parties in interest, I believe that the implementation of the Complex Cases Procedures will mitigate the administrative costs of these cases and reduce certain uncertainties that may arise in the course of these Chapter 11 Cases.

46.    Although I understand that a list of creditors usually is filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, debtors may file a consolidated creditor matrix "in the interest of justice." Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be expensive, time consuming, and administratively burdensome at this juncture.

47.    Additionally, I believe that it is appropriate to authorize the Debtors to redact from the Creditor Matrix the home or email addresses of individual creditors—including the Debtors'

current and former employees—and interest holders because such information could be used, among other things, to perpetrate identity theft or to locate survivors of domestic violence, harassment, or stalking. The Debtors propose to provide an unredacted version of the Creditor Matrix to the Office of the United States Trustee for the Southern District of Texas, any official committee of unsecured creditors appointed in these Chapter 11 Cases, any party in interest upon reasonable request, and the Court.

**OPERATIONAL MOTIONS**

E.     ***Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing Maintenance of Existing Bank Accounts; (II) Authorizing Continuance of Existing Cash Management System; (III) Authorizing Continued Performance of Intercompany Transactions and Funding; and (IV) Granting Related Relief* (the "<u>Cash Management Motion</u>")**

48.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders: (i) authorizing the Debtors to (a) continue operating the Cash Management System (as defined herein), (b) honor and pay the Bank Fees (as defined herein) in the ordinary course, including any prepetition Bank Fees, (c) maintain existing business forms, and (d) continue intercompany transactions and funding consistent with the Debtors' historical practices, subject to the terms described herein; (ii) granting a waiver of the deposit and investment requirements imposed by section 345(b) of the Bankruptcy Code; and (iii) granting related relief.

### <u>The Cash Management System</u>

49.     To facilitate the efficient operation of their businesses, in the ordinary course, the Debtors, together with their non-Debtor affiliates, maintain a cash management system (the "<u>Cash Management System</u>") to collect, manage, and disburse funds used in their business. The Cash Management System is essential to the stability of the Debtors' assets and business objectives and to maximizing the value of their estates.

50.     Each component of the Cash Management System employed by the company is comparable to those of centralized cash management systems used by similarly-situated companies to manage their cash in an efficient and cost-effective manner. I believe the Cash Management System is essential to the stability of the Debtors' assets and business objectives and to maximizing the value of their estates. The Debtors' personnel maintain daily oversight over the Cash Management System and control the entering, processing, and releasing of funds, including in connection with Intercompany Transactions (defined below). As the Debtors require prompt access to cash for their daily operations, I believe any disruption of the Cash Management System would have an immediate and devastating adverse effect on the Debtors' operations to the detriment of their estates and stakeholders.

**Bank Accounts and Funds Flow**

51.     As of the Petition Date, the Debtors maintain eighteen (18) bank accounts (the "Bank Accounts") at four different banks (the "Cash Management Banks"). The Debtors' Cash Management System follows their three business segments: Serenova; Telstrat; and Lifesize. The primary Cash Management Bank for the Serenova and Telstrat segments of the Debtors' business is Wells Fargo; the primary Cash Management Bank for the Lifesize segment of the Debtors' business is Bank of America.[5] A listing of the Bank Accounts and other information with respect thereto is set forth on **Exhibit C** to the Cash Management Motion.

52.     The basic elements of the Debtors' current Cash Management System consist of sweep and operating accounts through which customer receipts are transferred from identified

---

[5] Bank accounts maintained by non-Debtor entities are part of the overall Cash Management System. Such accounts and the funds therein belong to the applicable non-Debtor party (subject to any applicable agreements), and are not commingled with the Debtor's accounts.

customer deposit accounts at the end of the day and cash sweep accounts are transferred to main operating accounts each night, as follows:

- Serenova: an automatic transfer from the cash sweep account (x2788) is initiated nightly into the master operating account (x2820). Serenova uses customer deposit accounts that are solely used for collecting receipts, including in foreign currencies.

- Telstrat: the sweep account is x8191 and the operating account is x5982.

- Lifesize: the sweep account is x2834 and the operating account is x5400. Lifesize uses customer deposit accounts that are solely used for collecting receipts. Lifesize is only able to bill in United States dollars.

53.     Payments to creditors and other parties are made from the Bank Accounts, in a variety of ways. A general diagram of the movement of funds within the Cash Management System is attached as Exhibit D to the Cash Management Motion.

54.     All funds on deposit in the Debtors' Bank Accounts are held by Wells Fargo Bank, SBV, Bank of America, and PNC Bank. Cash Management Banks that are insured by the Federal Deposit Insurance Corporation to the extent provided by law are on the Region 7 U.S. Trustee's list of approved depository institutions.

**Intercompany Transactions**

55.     In the ordinary course of business, Debtors Serenova LLC, Telstrat LLC, and Lifesize, Inc. engage in intercompany transactions and transfers of funds among various Bank Accounts, including making payments or providing services for the benefit of the Debtors' enterprise (collectively, the "Intercompany Transactions") that result in intercompany receivables and payables (collectively, the "Intercompany Claims") made in the ordinary course of business between and among Debtors and/or non-Debtor Affiliates. The Intercompany Transactions are an essential component of the Debtors' operations, and they are integral to the Debtors' ability to process payroll and payments to third party vendors, provide enterprise-wide management and support services, and otherwise facilitate operations on a daily basis. All revenue generated by the

non-Debtor Affiliates is collected by the Debtors, and, in exchange, pursuant to transfer pricing agreements, the Debtors fund the expenses of the non-Debtor Affiliates on a cost-plus basis. In particular, the Debtors provide funding to certain non-Debtor Affiliates to enable those non-Debtor Affiliates to pay wages and benefits to approximately 23 non-Debtor Affiliate employees resident in foreign jurisdictions. The transfer related to such expense is approximately $130,000 per month; however, such payments are accompanied by invoices from non-Debtor Affiliates in the amount of the transfer plus either 5% or 7.5% (based on the applicable transfer pricing agreements) such that any payment made by the Debtors serves to partially satisfy an invoice from the non-Debtor Affiliate and does not result in a net outflow of the Debtors' property.

56.     Intercompany Claims are reflected as journal entry receivables and payables in the Debtors' cash management software and accounting systems and, in certain instances, are documented through a transfer pricing agreement. The Company's finance team meets at least weekly to discuss the Company's cash position and any funding needs. The Debtors track all fund transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions. The Debtors generally account for their Intercompany Transactions (including the shared services and expenses) at the time of the transfer, at which time the Debtors record the transfers as journal entries on their books and records. As cost-plus entities, the non-Debtor Affiliates accrue a net receivable from the Debtors. At the end of each quarter, the Company creates invoices for any intercompany transfers, at which time the payables and receivables are netted, leaving increasing receivables from the Debtors at the non-Debtor Affiliates.

57.     I believe discontinuing the Intercompany Transactions would disrupt the Cash Management System and the Debtors' operations to the detriment of the Debtors, their creditors, and other stakeholders. Absent the ordinary course continuation of such transactions, the Debtors'

business would be irreparably harmed. The Debtors seek the authority to continue the Intercompany Transactions in the ordinary course of business on a postpetition basis including the funding of the non-Debtor Affiliate employee payroll and benefits, in a manner consistent with prepetition practice. The Debtors will be able to closely monitor and record the Intercompany Transactions under the Cash Management System.

58.     I believe the Debtors would be unduly burdened, both financially and logistically, if the Debtors were required to halt Intercompany Transactions or otherwise make material changes to the Cash Management System. The Debtors seek authority to continue the Intercompany Transactions in the ordinary course of business consistent with past practice and to grant administrative expense status to Intercompany Claims as a result of Intercompany Transactions.

**Bank Fees**

59.     The Debtors incur certain fees and charges in connection with the ordinary course operation of the Cash Management System in accordance with those certain prepetition deposit, cash management, and treasury services agreements between the Debtors and the Cash Management Banks (the "Bank Contracts") (collectively, the "Bank Fees"), which are typically withdrawn by a Cash Management Bank directly from the applicable Bank Account. The Bank Fees include, without limitation, account maintenance charges, charges relating to ACH and wire transfers, service charges, and other customary miscellaneous charges. On average, the Debtors incur approximately $15,000 in Bank Fees per month. The Debtors do not believe there are any material prepetition Bank Fees outstanding on the Petition Date, but nonetheless seek approval to pay and, for each Cash Management Bank to deduct, any such Bank Fees in the ordinary course when due.

**Business Forms**

60.     The Debtors utilize numerous business forms in the ordinary course of their business (including, without limitation, letterhead, purchase orders, and invoices), including in connection with their Cash Management System (the "Business Forms"). I understand that the Debtors would be required by the United States Trustee (the "U.S. Trustee") under the U.S. Trustee's *Operating Guidelines for Chapter 11 Case* (the "U.S. Trustee Guidelines") to incur the expense and delay of ordering entirely new Business Forms referencing the Debtors' status as debtors-in-possession absent relief from the Court. The Debtors seek authority to use pre-existing Business Forms without such a reference in order to minimize expense to the estates. The Debtors submit that parties in interest will not be prejudiced if such relief is granted because parties doing business with the Debtors will likely be aware of their status as debtors-in-possession and, therefore, changing Business Forms is unnecessary and would be unduly burdensome. To the extent the Debtors exhaust their existing supply of Business Forms, the Debtors will reorder Business Forms with the designation "Debtor-in-Possession" and the corresponding case number.

**Compliance with the U.S. Trustee Guidelines and Bankruptcy Code section 345**

61.     I understand that pursuant to the U.S. Trustee Guidelines, the U.S. Trustee generally requires chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the U.S. Trustee's office. As set forth in **Exhibit C** to the Cash Management Motion, the Bank Accounts are maintained at Wells Fargo Bank, Silicon Valley Bank, Bank of America, and PNC Bank, all of which are designated as authorized depositories by the U.S. Trustee, pursuant to the U.S. Trustee Operating Guidelines. To the extent any of the Debtors' Bank Accounts are not in compliance with section 345(b) of the Bankruptcy Code or any of the U.S. Trustee's requirements or guidelines, the Debtors

seek an extension until June 16, 2023, without prejudice to seeking an additional extension, to come into compliance with section 345(b) of the Bankruptcy Code.

62.     In sum, I believe the Cash Management System is critical to the ongoing stability of the Debtors' businesses and smooth transition into chapter 11.  The Debtors will continue to work in good faith with the U.S. Trustee to address any concerns regarding the continued use of these accounts on a postpetition basis.  Accordingly, the Court should grant the relief requested in the Cash Management Motion.

**F.**     ***Debtors' <u>Emergency</u> Motion For Entry of an Order Authorizing the Debtors to (I) Pay and/or Honor Prepetition Wages, Salaries, Bonus Payments, Employee Benefits, and Other Compensation; (II) Remit Withholding Obligations and Deductions; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests* (the "<u>Wage Motion</u>")***

63.     Pursuant to the Wage Motion, the Debtors seek entry of an order: (i) authorizing the Debtors to pay prepetition Withholding Obligations, Reimbursable Expenses, Bonus Programs, Commission Program, and related obligations (each as defined herein and as set forth in the chart below); (ii) authorizing the Debtors to honor and continue Health and Welfare Benefits programs; (iii) authorizing the Debtors to pay Supplemental Workforce Obligation and Canadian Wages Obligations; (iv) authorizing the Debtors' cash management banks and financial institutions at which the Debtors maintain disbursement and other accounts (collectively, the "<u>Banks</u>") to receive, process, honor, and pay all checks issued and electronic payment requests made related to such Compensation and Benefits obligations; and (v) granting related relief.

| Relief Sought | Amount |
|---|---|
| **Workforce Compensation and Related Obligations** | |
| Wage Obligations | $26,000 |
| Withholding Obligations | $40,000 |
| Payroll Taxes | $12,000 |
| Payroll Processing Fees | $5,000 |
| Reimbursable Expenses | $25,000 |
| Bonus Programs | $26,000 |
| Commission Program | $100,000 |
| **Health and Welfare Benefits** | |
| Medical, Vision, and Dental Coverage | $115,000 |
| Life, AD&D, and Disability Coverage | $5,000 |
| **Supplemental Workforce Obligations** | |
| IC Workforce Obligations | $165,000 |
| Canadian Workforce Obligations | $3,000 |
| **TOTAL** | **$522,000** |

**General Workforce Overview**

64.     The Debtors primarily operate through two different divisions: (i) Lifesize, which operates through Lifesize, Inc. and its subsidiaries; and (ii) Serenova, which operates through Serenova, LLC and its subsidiaries. As of the Petition Date, the Debtors employ approximately 67 employees, all of whom are Lifesize, Inc. employees (the "Employees"). The Debtors' Employees include both salaried and hourly employees.

65.     The Debtors' workforce also includes approximately 72 independent contractors (the "Independent Contractors"), some of whom are sourced from various staffing agencies (the "Staffing Agencies") and some are directly contracted to fulfill certain duties on a short and long-term basis. Finally, the Debtors fund the payroll of 9 employees of non-Debtor Affiliate LiveOps Cloud Platform Canada, Inc. (the "Canadian Employees" and, together with the Employees and Independent Contractors, the "Workforce")).[6]

---

[6] In addition to the Canadian Employees, the non-Debtor Affiliates employ 23 employees around the globe. The Debtors do not directly fund the payroll of these employees, but do indirectly fund such payroll as part of the Company's cash management system. The payment is then accounted for on the Debtors' and non-Debtor Affiliates' books as receivables and payables, respectively. Authority to continue this practice is sought in the *Debtors'*

66.    The vast majority of the Workforce rely on their compensation and benefits to pay their daily living expenses. I believe these individuals will be unfairly harmed if the Debtors are not permitted to continue paying their compensation and providing health and other benefits during these Chapter 11 Cases. For the avoidance of doubt, the Debtors do not believe that they owe Compensation to any Employee in excess of the statutory cap of $15,150 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

### *Employee Obligations*

67.    In the ordinary course, the Debtors incur obligations to their Employees for base salary and wages (the "Wage Obligations"). All of the Debtors' Employees are paid on the same semi-monthly schedule. On average, the Debtors pay approximately $280,000 per week in Wage Obligations. The date hereof, May 16, 2023, falls on the day after the Debtors' regular pay date for their Employees, which was already funded to Automatic Data Processing, Inc., the Debtors' payroll processor ("ADP") and covers the period May 1, 2023 through May 15, 2023. The Debtors' next regular semi-monthly pay date for their Employees is May 31, 2023—which will be funded to ADP in the ordinary course of business on May 29, 2023—for the period from May 16, 2023 through May 31, 2023. The Debtors' next regular semi-monthly pay date for their Employees will be on June 15, 2023 for the period from June 1, 2023 to June 15, 2023. Accordingly, as of the Petition Date, the Debtors estimate that they owe $26,000 on account of accrued but unpaid Wage Obligations (the "Unpaid Wages").

---

*Emergency Motion for Interim and Final Orders (I) Authorizing Maintenance of Existing Bank Accounts; (II) Authorizing Continuance of Existing Cash Management System; (III) Authorizing Continued Performance of Intercompany Transactions and Funding; and (IV) Granting Related Relief* (the "Cash Management Motion").

### a. *Withholding Obligations*

68.     During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks for, among other things, garnishments, child support, retirement savings, and other pre-tax deductions payable pursuant to certain of the Health and Welfare Benefits (as defined below and collectively, the "Deductions"). The Deductions are forwarded to various third-party recipients.

69.     Additionally, I understand the Debtors are required by law to withhold amounts related to, among other things, federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are funded to ADP the business day after Wage Obligations are funded. The Payroll Taxes generally are processed and forwarded to the appropriate federal, state, or local taxing authority by ADP at the same time the Employees' payroll checks are disbursed. Accordingly, as of the Petition Date, the Debtors estimate that they owe $12,000 on account of pre-petition Employee Payroll Taxes.

70.     Most withholding of Deductions is made by APD in connection with the Wages, for which the Debtors believe there is no prepetition amount owing. However, withholding on account of an Employee's contributions to (1) his or her health savings account (HSA) and/or flexible spending account (FSA) and (2) his or her 401(k) plan described below are withdrawn several business days after the payroll date. Accordingly, as of the Petition Date, the Debtors

estimate that they owe approximately $40,000 on account of accrued but unpaid Deductions (collectively, the "Withholding Obligations").

### b.    Payroll Processing

71.    The majority of the Debtors' Wage Obligations are satisfied by direct deposit through the electronic transfer of funds from the Debtors' payroll department to each Employee's bank account, with the balance of Employees receiving checks. The Debtors outsource this operation to ADP. In particular, ADP is responsible for serving as the Debtors' payroll and federal W-2 tax form processing vendor, as well as completing the Debtors' payroll tax filings, including federal, state, and local filings. In addition, for each payroll period, ADP processes direct deposit transfers or administers payroll checks to Employees from certain disbursement accounts funded by the Debtors with the amount necessary to satisfy the Debtors' payroll obligations. I believe ADP is integral to the Debtors' payroll process and facilitates accurate and fair compensation based on time worked, performance, and incentives earned.

72.    The Debtors pay fees to ADP for payroll processing services (the "Payroll Processing Fees"). As of the Petition Date, the Debtors estimate that they owe approximately $0 to ADP in prepetition Payroll Processing Fees. Out of an abundance of caution, the Debtors are seeking authority to pay up to $5,000 of prepetition Payroll Processing Fees.

### c.    Reimbursable Expenses

73.    Certain Employees customarily incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. Such expenses may include, but are not limited to, cell phone expenses and business-related travel expenses (the "Reimbursable Expenses").

74.    Generally, Employees pay for the Reimbursable Expenses personally and submit expense report forms to the Debtors for reimbursement. In some cases, Employees may not have

submitted reimbursement requests in time to have been processed prior to the Petition Date. In the aggregate, the Employees incur, on average, approximately $20,000 per month in Reimbursable Expenses, although these amounts can vary from month to month depending on the amount of expenses incurred at any given time.

### d.      *Non-Insider Employee Bonus Payments and Commissions*

75.      **Employee Bonus Programs.** The Debtors provide certain Employees with retention, performance and other bonuses (collectively, the "<u>Bonus Programs</u>") in the ordinary course of business. As of the Petition Date, the Debtors estimate they may owe up to $26,000 on account of earned and accrued unpaid amounts under the Bonus Programs (the "<u>Bonus Payments</u>"). None of the Employees to whom Bonus Payments will be paid are insiders of the Debtors. The Debtors wish to honor the prepetition amounts owed to their Employees for Bonus Payments as these amounts are an element of compensation that is relied upon by eligible Employees.

76.      **Commissions.** Twelve of the Debtors' Employees received commissions based on the achievement of certain sale thresholds (the "<u>Commission Program</u>"). These commissions are considered part of the recipient Employees' overall compensation even though they are tied to the successful sale of the Debtors' products and services. As of the Petition Date, the Debtors estimate that they may owe up to $100,000 in accrued but unpaid commissions owed under the Commission Program (the "<u>Prepetition Commissions</u>").

### e.      *Health and Welfare Benefits*

77.      The Debtors offer their Employees the ability to participate in a number of health, insurance, and benefits programs, including, among other programs, medical and prescription, life and disability insurance, dental insurance, vision insurance, and other employee benefit plans

(collectively, the "Health and Welfare Benefits"). The Debtors' Health and Welfare Benefits include:

(a) **Medical Coverage**: The Debtors offer self-insured medical programs (the "Medical Coverage") through carrier Cigna Health and Life Insurance ("Cigna") for their Employees. Employees have the option to waive coverage if they are covered under another insurance plan. Under the Medical Coverage, the Debtors a portion of the cost of premiums, while the Employees cover the remaining amounts. Legal spouses, domestic partners, and children are eligible dependents. The annual cost of the Medical Coverage to the Debtors is approximately $1,250,000. As of the Petition Date, the Debtors estimate they owe approximately $105,000 in the aggregate on account of incurred but yet unpaid (a) Medical Coverage premiums and (b) medical claims, pharmacy claims, and medical stop loss claims.

(b) **Dental Coverage**: The Debtors offer dental coverage programs (the "Dental Coverage") through Cigna for their Employees. Legal spouses, domestic partners, and children are eligible dependents. The annual cost of the Dental Coverage to the Debtors is approximately $84,000. As of the Petition Date, the Debtors estimate they owe approximately $7,000 on account of incurred but yet unpaid Dental Coverage premiums.

(c) **Disability, Life and AD&D Coverage**. The Debtors offer long-term disability, life and accidental death and dismemberment insurance (the "Disability, Life and AD&D Coverage") through Life Insurance Company of North America for their Employees. Under the Life AD&D Coverage, the Debtors cover 100% of the costs of premiums for basic coverage and Employees have the option to purchase additional coverage at their own expense. As of the Petition Date, the Debtors estimate they owe approximately $5,000 on account of incurred but yet unpaid Life and AD&D Coverage premiums.

(d) **COBRA Coverage**: Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), certain Employees who are no longer employed by the Debtors (the "COBRA Employees") may continue Medical Coverage, Vision Coverage, and Dental Coverage (the "COBRA Benefits"). COBRA Employees are entitled by law to continue to receive COBRA Benefits for up to 18 months, and in some instances up to 36 months, following termination of employment.

(e) **No-Cost Programs**: Employees have the option to participate in other Health and Welfare Benefit programs that the Debtors offer including identity theft protection and legal aid (collectively, the "No-Cost Programs"). The No-Cost Programs are funded entirely by Deductions from participating Employees' Wages and do not result in any cost to the Debtors. The Debtors seek authority to fulfill their obligations under the No-Cost Programs and to continue the No-Cost Programs in the ordinary course of business on a postpetition basis.

78.     As described above, failure to continue the Health and Welfare Benefits could cause Employees to experience severe hardship and make it difficult to retain the Debtors' Workforce.

### f.      *401(k) Plan*

79.     The Debtors maintain a retirement savings plan for the benefit of their U.S. Employees that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"). The 401(k) Plan is administered by Charles Schwab and allows for automatic pre-tax salary deductions of eligible compensation up to the limits set forth by the Internal Revenue Code. The Debtors do not match contributions although they do pay for an annual audit which costs approximately $14,000.

### g.      *Workers' Compensation Insurance*

80.     The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each state in which they have Employees (collectively, and as described herein, the "Workers' Compensation Program"). As part of the Workers' Compensation Program, the Debtors maintain a workers' compensation insurance policy with CNA Insurance (collectively the "Workers' Compensation Policies"), for which the annual premium is approximately $39,000, and is paid in nine installments.

81.     The Debtors must continue claim assessment, determination, adjudication, and payment pursuant to the Workers' Compensation Program, without regard to whether such liabilities are outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[7] There are currently no active open claims under the Workers' Compensation Program. To the extent any Employees assert claims arising under the Workers' Compensation Program, the Debtors request that the Court modify the

---

[7] The Debtors' Workers' Compensation Program may change postpetition in the ordinary course due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.

automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with such claims. This requested modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

82.     Because I understand the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that potentially could disrupt the reorganization process. As of the Petition Date, the Debtors believe they owe approximately $0 on account of accrued but unpaid Workers' Compensation Program obligations.

**Supplemental Workforce Obligations**

83.     In addition, the Debtors make payments to and for the benefit of Independent Contractors (the "IC Workforce Obligations") and Canadian Employees (the "Canadian Workforce Obligations" and, together with the IC Workforce Obligations, the "Supplemental Workforce Obligations") for the performance of certain services important to the Debtors' operations.

84.     The Independent Contractors work side-by-side with the Debtors' Employees, as described above, and are critical to the Debtors' ongoing operations. On average, the Debtors pay approximately $310,000 per month in IC Workforce Obligations to Independent Contractors, including fees that the Debtors remit to Staffing Agencies in exchange for the services they provide with respect to the Independent Contractors and certain temporary Employees. As of the Petition Date, the Debtors estimate that they owe approximately $165,000 of accrued but unpaid IC Workforce Obligations.

85.     While the Canadian Employees are employees of non-Debtor Affiliate LiveOps Cloud Platform Canada, Inc., the Debtors have historically funded the Canadian Workforce

Obligations as a matter of administrative convenience. When the Debtors fund payroll or wage related benefits for the Canadian Employees, the cost thereof is recorded as an intercompany receivable[8] for which authorization to continue such practice is sought in the Cash Management Motion. Further, the Canadian Employees are critical to the Debtors' ongoing operations. On average, the Debtors pay approximately $55,000 per month in Canadian Workforce Obligations to the Canadian Employees. As of the Petition Date, the Debtors estimate that they owe $3,000 of accrued but unpaid Canadian Workforce Obligations.

86.     I believe the authority to pay prepetition Supplemental Workforce Obligations and continue paying the Independent Contractors and Canadian Employees is critical to maintaining and administering their estates.

87.     I believe the relief requested in the Wage Motion enhances value for the benefit of all interested parties. Finding, attracting, and training new qualified talent would be extremely difficult and would most likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

88.     Furthermore, based on my experience, I believe that many Employees may live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. These Employees may be exposed to significant financial and healthcare-related problems if the Debtors are not permitted to pay and/or honor the Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtors' business.

89.     In addition, I believe that the Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the successful reorganization of

---

[8] Authorization to continue the Debtors' practice of intercompany transactions is sought in the Cash Management Motion.

the Debtors' business.  Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to sustain their operations. Satisfaction of the Wages and Benefits, as described herein, is necessary to maintain the Employees' morale during the cases and to insure continued, efficient operation in order to maximize value for all creditors.

**G.**   ***Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, and (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, Including Entry Into Premium Financing or Installment Payment Arrangements* (the "<u>Insurance Motion</u>")**

90.     Pursuant to the Insurance Motion, the Debtors seek an order (i) authorizing the Debtors to (a) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business,[9] and (b) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis, including entering into any premium financing or installment payment arrangements; and (ii) granting related relief.

91.     In the ordinary course of the Debtors' business, the Debtors maintain numerous insurance policies providing coverage for, among other things, general liability, property and casualty, automotive, business property, stop gap, umbrella, cyber liability, commercial property, commercial management liability, and directors' and officers' liability, (collectively, the "<u>Insurance Policies</u>," and the carriers thereof, the "<u>Insurance Carriers</u>"). The Insurance Policies are essential to the preservation of the Debtors' business and assets, and, in many instances, such insurance coverage is required by regulation, law, or contract that governs the Debtors' business.

---

[9]  Nothing in this motion constitutes an admission of any payments due or past due under or related to any of the Insurance Policies (as defined below).

92.     The Debtors pay the annual premiums for their policies written by CNA Insurance Companies (the "CNA Policies"), for which the collective annual premium is approximately $183,000, with a 25% down payment followed by nine monthly installments of approximately $15,500 per month . The Debtors estimate the remaining amount owed under the CNA Policies is approximately $61,000, with approximately $15,500 due as of the Petition Date. The Debtors pay the premiums for all other Insurance Policies in advance, and therefore do not have any prepetition amounts outstanding under those policies.

93.     To preserve the value of the Debtors' business operations, properties, and assets, I believe it is essential that the Debtors be able to continue or renew the Insurance Policies and enter into new insurance policies. In certain instances, regulations, laws, and contract provisions that govern the Debtors' commercial activities may require the types of coverage provided for under the Insurance Policies, as well as the Bankruptcy Code and the operating guidelines issued by the United States Trustee for Region 7 (the "U.S. Trustee Guidelines").

**Insurance Brokerage Fees**

94.     The Debtors obtain Insurance Policies through Lockton Companies (collectively, the "Insurance Brokers"). The Insurance Brokers assist the Debtors in obtaining comprehensive insurance coverage and with the procuring and negotiating the Insurance Policies, enabling the Debtors to obtain Insurance Policies on what I believe to be advantageous terms and at competitive rates. The Insurance Brokers collect fees for services rendered as part of the premiums paid on the Insurance Policies (the "Brokerage Fees"), including the monthly premium payments the Debtors propose to pay postpetition in the ordinary course of business. As of the Petition Date, the Debtors do not believe that any amounts are due and owing any amounts on account of the Brokerage Fees. Pursuant to this Motion, the Debtors seek authority to pay any

outstanding prepetition Brokerage Fees and to continue to honor any Brokerage Fees as they come due on a postpetition basis in the ordinary course of business.

**H.** ***Debtors' <u>Emergency</u> Motion (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* (the "<u>Taxes Motion</u>")**

95.     Pursuant to the Taxes Motion, the Debtors seek an order (a) authorizing the Debtors to remit and pay or use tax credits to offset prepetition Taxes and Fees and postpetition Taxes and Fees (defined herein) as they become due and owing, and (b) granting related relief.

96.     In the ordinary course of business, the Debtors collect, withhold, and incur taxes and fees related to sales and use, income, franchise, annual reporting fees, audits, and business and regulatory fees (collectively, the "<u>Taxes and Fees</u>"). The Debtors remit the Taxes and Fees to various governmental authorities in the states and localities in which they conduct business (collectively, the "<u>Authorities</u>").

97.     The Debtors seek authority to make payments where (a) the Taxes and Fees have accrued or were incurred prepetition but (i) were not paid prepetition or (ii) were paid in an amount less than actually owed, (b) the Debtors made payments prepetition that were lost or the Authorities did not receive the prepetition payments in full, which may give rise to interest and other penalties, (c) the Taxes and Fees were incurred for prepetition periods and become due and payable after the Petition Date, (d) the Taxes and Fees accrued or are incurred postpetition, and (e) the Taxes and Fees are for so-called "straddle" periods.

98.     I believe failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in various ways, including: (a) the Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the bankruptcy process; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the estates; and (c) in certain

instances, the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' restructuring. Unpaid Taxes and Fees may result in fines and penalties, the accrual of interest, or both. Finally, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.

**Sales and Use Taxes**

99.      The Debtors collect and remit sales, use and related taxes (collectively, "Sales and Use Taxes"), to the Taxing Authorities in approximately seventeen states and localities in connection with the sale of their goods in those states. As of the Petition Date, the Debtors believe that they are current on Sales and Use Taxes, but have likely accrued approximately $75,000 in Sales and Use Taxes.

100.      The Debtors use the services of a third-party servicer, Avalara Inc. ("Avalara"), to pay their Sales and Use Taxes. Avalara calculates the amount of Sales and Use Taxes owed based on the Debtors' invoices on the Debtors' system, prepares and submits tax returns for the Debtors, and draws on the Debtors' bank account to fund the Sales and Use Taxes. The Debtors request authority to continue to use Avalara to process tax payments and to pay any fees that become due and owing to Avalara in the ordinary course of business. As of the Petition Date, the Debtors believe that they are current fees due to Avalara, but have likely accrued approximately $2,000 in fees due to Avalara on account of the prepetition period but which have not yet come due.

**Franchise Taxes**

101.      The Debtors are required to pay franchise taxes (the "Franchise Taxes") to certain Taxing Authorities to operate their businesses in the applicable taxing jurisdiction. Certain states may refuse to qualify a debtor to do business in a state or recognize a name change, merger or

other activity if franchise taxes have not been paid. Most jurisdictions assess franchise taxes on an annual basis, in arrears. As of the Petition Date, the Debtors do not believe they there are any Franchise Taxes due.

**Income Taxes**

102.    The Debtors are required to pay income, withholding, or similar taxes to federal,[10] state, and local Authorities to operate their business in the applicable taxing jurisdictions (the "Income and Other Taxes"). The Debtors pay Income and Other Taxes on a quarterly or annual basis. As of the Petition Date, the Debtors estimate that they have accrued approximately $111,000 in Income and Other Taxes, of which approximately $67,000 is currently payable or will become payable during the first 21 days following the Petition Date.

103.    I believe that the Debtors' ability to pay the Taxes and Fees is critical to their continued and uninterrupted operations. Any collection action on account of such claims and any potential ensuing liability would distract the Debtors and their personnel from their restructuring objectives to the detriment of all parties in interest.  The dedicated and active participation of the Debtors' officers and employees is integral to the Debtors' continued operations and essential to the orderly administration and, ultimately, the success of these Chapter 11 Cases.

104.    I further believe that the relief requested in the Taxing Motion is reasonable in light of the added costs and penalties that may be incurred if such amounts remain unpaid. Specifically, I understand that the Debtors' Taxes and Fees obligations may ultimately result in increased liabilities for the Debtors if interest and penalties accrue on the Tax and Fee claims, which amounts may also be entitled to priority treatment.  I believe that such a result would be contrary to the best interests of the Debtors' estates and all stakeholders.

---

[10] The Debtors do not believe they owe any income taxes to the Federal government, but instead hold net operating losses.

I.  *Debtors'* <u>*Emergency*</u> *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Lien Claimants, (B) Critical Vendors, (C) Customs and Regulatory Claimants, and (II) Granting Related Relief* **(the "**<u>**Critical Vendor Motion**</u>**")**

105.    Pursuant to the Critical Vendor Motion, the Debtors seek an order authorizing the Debtors to pay (i) shippers, warehousemen, and other lien claimants (each, a "<u>Shipping Claimant</u>") and (ii) essential vendors and service providers (each, a "<u>Critical Vendor</u>", and, together with the Shipping Claimants, the "<u>Trade Claimants</u>")), subject to the limits set forth below; and (b) granting related relief.

106.    As of the Petition Date, the Company owes approximately $26.4 million on account of all general unsecured debt, including the company's trade debt, unsecured bridged loan, and amounts allegedly owning on a terminated lease. By this motion, the Debtors are seeking authority to pay an amount necessary to preserve the value of their estates, which shall not exceed $3,420,000, on account of prepetition claims held by the Trade Claimants and accrued in the ordinary course of business (collectively, the "<u>Trade Claims</u>"). The Debtors intend to apply their business judgment and discretion on a case-by-case basis and pay only those Trade Claims that are critical to maintaining their supply chain.

107.    The following table summarizes the types of claimants that the Debtors request authority to pay pursuant to this motion:

| Category | Description of Claims | Estimated Amount Outstanding as of the Petition Date |
|---|---|---|
| Shipping Claims | Claimants that may assert shippers, warehouseman, mechanics, or other liens against the Debtors' property if unpaid | $120,000 |
| Critical Vendor Claims | Vendors that supply goods or services that the Debtors rely upon to continue day-to-day operations, or which are sole or limited-source providers of the goods, equipment, and services necessary for the uninterrupted operations of the Debtors' business | $3.3 million |

**The Shipping and Warehouse Claimants**

108.    As part of their business operations, the Company relies on a variety of service providers, common carriers, contract carriers, freight brokers, shippers, truckers, and/or warehouses (collectively, the "Shippers") to transport, deliver, and hold their products. The Debtors utilize the services of AFS Global Freight Management (a freight consolidator) to ship goods. In addition, the Company uses five main shipping and warehousing vendors for its distribution and delivery processes: (1) DSV Netherlands; (2) GXO US; (3) DSV Malaysia; (4) DSV China; and (5) DSV India. With respect to the Company's operations in the U.S. and Netherlands, the majority of the Company's inventory flows through the Shippers and the Company's materials are not stored at these locations. With respect to the Company's operations in Malaysia and India, the Shippers store both raw materials and inventory. With respect to the Company's operations in China, only a negligible amount of the materials and inventory are stored.

109.     I believe it is essential to the Debtors' businesses that the Company maintains its supply and distribution system without interruption. The success of the Debtors' business depends on the regular and continued outbound shipping and delivery of finished products.

110.     The Debtors estimate that the aggregate unpaid prepetition balance owing to the Shipping Claimants totals $120,000. The Debtors further estimate that replacing the product in the possession of certain of the Shipping Claimants, if they asserted their alleged possessory lien on such product, would cost a large multiple of the prepetition amount owing to them.

111.     I understand that under certain applicable non-bankruptcy laws, carriers or warehousemen have a lien on the goods in their possession, securing the charges or expenses incurred in connection with the transportation or storage of such goods. Thus, certain of the Shipping Claimants may would be secured creditors by virtue of their liens on the goods in their possession to the extent of their unpaid prepetition claims.

112.     For the avoidance of doubt, the Debtors seek authority to pay only those amounts that they determine, in their sole discretion, are necessary or appropriate to (a) obtain release of critical or valuable goods, (b) maintain a reliable, efficient, and smooth distribution system, (c) avoid defaults under the Debtors' real property leases caused by third-party mechanic's liens, and (d) induce the Shipping Claimants to continue performing and otherwise supporting the Debtors' operations on a postpetition basis.

113.     I believe that if the requested relief is granted the total amount to be paid to the Shipping Claimants will be less than the losses the Debtors may suffer if their operations are disrupted and/or the Debtors are forced to replace lost product. Payment of the amounts due to the Shipping Claimants will not otherwise disrupt the priority of the Bankruptcy Code's

distributions because the Shipping Claimants' claims are secured by their statutory liens with respect to the goods in their possession.

### The Critical Vendors

114.    I believe timely, uninterrupted provision of goods and services is crucial to the Debtors' business. The vast majority of the Trade Claims is on account of telephony or data center services, which, if shut off, would turn off portions of the Debtors' customer networks, resulting in catastrophic harm to the Debtors' business. Moreover, certain of the Debtors' Critical Vendors are located overseas and may not be cognizant of or concerned with the implications of the automatic stay. Particularly at the commencement of these Chapter 11 Cases, the Debtors cannot afford to have vital services cut off. Any such interruption would be devastating to the Debtors, their business and their efforts to restructure.

115.    The Debtors have determined, in an exercise of their business judgment, that their continued receipt of certain goods and services such as telephony providers, is necessary to ensure that there are not any unexpected or inopportune interruptions in the Debtors' business operations, and to preserve and maximize the value of the estates. Without the relief requested herein, I believe that many of the Critical Vendors may cease delivering goods and providing services to the Company.

116.    Furthermore, the services and products are not readily available from other sources. As such, in order to maintain these important supplier relationships, the Debtors are not at liberty to replace such a supplier without significant impact on the business and, therefore, cannot resort to or otherwise utilize an alternative supplier. Accordingly, interruption in such goods or services could have devastating consequences for the Debtors' efforts to continue to operate its business in the ordinary course in order to effectuate a successful restructuring.

117.     The Debtors have thoroughly reviewed their business relationships and identified the Critical Vendors, the loss of whose particular goods or services would cause immediate and irreparable harm to the Debtors' business. To identify the Critical Vendors, the Debtors reviewed their accounts payable and prepetition vendor lists to identify those creditors most essential to the Company's operations pursuant to the following criteria: (a) which suppliers were sole source or limited source suppliers, without whom the Company could not continue to operate without disruption, (b) the Company's ability to find alternative sources of supply and the potential disruption or lost revenues while a new supplier was resourced, (c) which suppliers would be prohibitively expensive to replace, (d) which suppliers would present an unacceptable risk to the Company's operations given the volume of essential services or products that such suppliers provide, (e) the extent to which suppliers may assert an administrative expense pursuant to section 503(b)(9) of the Bankruptcy Code; and (f) whether a vendor meeting the foregoing criteria is able or likely to refuse to ship product to the Company postpetition if its prepetition balances are not paid even if the vendor is under a contractual obligation to perform, but the vendor's failure to perform would constitute a disruption of the Debtors' business.

118.     If authorized to pay the Critical Vendor Claims, the Debtors will, in their discretion, use commercially reasonable efforts to require the applicable Critical Vendors to provide favorable trade terms consistent with historical practice. The Critical Vendor Motion seeks authority for the Debtors to condition payment of a Critical Vendor Claim on a Critical Vendor's agreement to continue providing supplies or services to the Debtors in accordance with each Critical Vendor's agreement to (a) accept such payment in satisfaction of all or part of its Critical Vendor Claim, and (b) continue to provide supplies or services to the Company during these Chapter 11 Cases on (i) the most favorable trade terms, practices, and programs (including, but

not limited to, credit limits, rebates, discounts, pricing, timing of payments, and availability, and

other applicable terms and programs) in place during the twelve (12) months before the Petition

Date or (ii) such other favorable terms as the Debtors and the Critical Vendor may mutually agree

on ((a) and (b) together, "Customary Trade Terms").

## FINANCING MOTION

**J.**   ***Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief (the "DIP Financing Motion")***

119.    The Debtors require immediate access to the DIP Loans, and continued use of Cash

Collateral, to fund operations, capital expenditures, and the administrative costs of these Chapter

11 Cases. As of the Petition Date, the Debtors' cash on hand was less than $100,000, which is

insufficient to operate their enterprise and continue paying their obligations as they come due.

The Debtors' business is cash-intensive, with significant daily costs required to satisfy obligations

to the Debtors' customers, landlords, vendors, and employees.

120.    The Debtors rely on the liquidity generated from their operations to, among other

things, procure mission-critical telecommunications and web-hosting services vital to the

Debtors' ongoing business operations. Because the Debtors operate in a competitive industry, I

believe a seamless transition into chapter 11 and the ability to continue uninterrupted operations

is imperative to preserve relationships with the Debtors' suppliers and the loyalty and goodwill

of their customers, vendors, and employees.

121.    I, along with other members of the Debtors' management and advisory teams, have

carefully reviewed and analyzed the Debtors' projected cash receipts and disbursements and

prepared a budget outlining the Debtors' postpetition cash needs over the initial 13 weeks of the

Chapter 11 Cases. The Debtors relied on these forecasts to determine the minimum amount of postpetition financing required to fund operations and administer these Chapter 11 Cases. More specifically, the Debtors determined that they require immediate access to DIP financing to fund the costs of these Chapter 11 Cases and ongoing business operations.

122.     I believe that the DIP Facility provides the Debtors with sufficient liquidity to maintain their operations, fund the administration of these Chapter 11 Cases, and provide sufficient runway to consummate a going-concern sale of substantially all the Debtors' assets. The DIP Facility will allow the Debtors to: (a) continue satisfying obligations to the Debtors' contract counterparties; (b) provide the liquidity necessary to honor amounts owed to critical vendors, as well as to continue favorable trade terms with such parties; (c) reassure other stakeholders, including the Debtors' customers and employees, that the Debtors have sufficient funds to continue operating in the ordinary course; (d) fund the Debtors' payroll obligations; and (e) fund the administrative costs of these Chapter 11 Cases.

123.     During the pendency of these Chapter 11 Cases, the Debtors intend to use a portion of the proceeds from the DIP Facility to honor their postpetition obligations to their vendors, employees, and customers. Accordingly, the proposed DIP Facility will provide much needed stabilization to the Debtors' business operations. The DIP Facility will also provide the funding means to undertake a sale process and ensure the Debtors' ability to operate as a going-concern, preserving value of the Debtors' estates for the benefit of all stakeholders.

124.     Absent funds available from the DIP Loans and access to Cash Collateral, I believe the Debtors could face a value-destructive interruption to their business and lose support from important stakeholders on which the Debtors' business depends. This, in turn, would hinder the

Debtors' ability to maximize the value of their estates, and the Debtors would be forced to curtail their operations significantly, or even cease operations, to the severe detriment of all stakeholders.

125.    I believe the adequate protection proposed is fair and reasonable under the circumstances. The Adequate Protection package proposed for the Prepetition Lenders includes the liens and superpriority claims described in the Interim Order. Taken together, the cumulative effect of all of these provisions is to provide reasonable and appropriate adequate protection for the Prepetition Secured Parties. I believe the proposed Adequate Protection is sufficient to protect the Prepetition Secured Parties from any diminution in value to the Prepetition Collateral, including Cash Collateral. In light of the foregoing, the proposed Adequate Protection to be provided for the benefit of the Prepetition Secured Parties is appropriate

126.    Access to the Prepetition Secured Parties' Cash Collateral will provide liquidity vital for the Debtors to maintain operations, pay employees, and fund these Chapter 11 Cases. Thus, the Debtors' provision of the Adequate Protection is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using Cash Collateral for the benefit of all parties in interest and their estates.

127.    Absent the liquidity infusion to be provided by the DIP Facility, I believe the Debtors would need to curtail their operations significantly and their very existence as a going concern would be threatened. Even with the ability to access Cash Collateral, cash-on-hand and expected inflows would not be sufficient to fund their operations as a going concern in the near term nor meet the administrative expenses incurred in the Cases. Without a new source of liquidity, the Debtors' businesses would almost certainly be irreparably harmed. Consequently, the DIP Facility is necessary to preserve the value of the Debtors' estates.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Executed this 16th day of May, 2023 at Los Angeles, CA.

/s/ Marc Bilbao
Marc Bilbao

# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION**

|  |  |
|---|---|
| In re:<br><br>LIFESIZE, INC.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-50038 (DRJ)<br><br>(Joint Administration Requested) |

**DECLARATION OF JAMES KANG IN SUPPORT OF EMERGENCY MOTION OF
DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING**

I, James Kang, pursuant to section 1726 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.       I am a Vice President of Piper Sandler & Co. ("Piper Sandler"), the investment bankers for Lifesize, Inc. and its affiliates (the "Debtors"), whom the Debtors engaged in March 2023 as their investment banker to explore the market for a sale of substantially all the Debtors' assets as well as obtaining financing for a potential Chapter 11 case. I have more than five years of restructuring experience and have advised companies, creditors, investors, and financial sponsors on complex transactions including out-of-court and in-court restructurings, financings, and mergers and acquisition. Prior to joining Piper Sandler, I was a member of TRS Advisors, a restructuring advisory firm, and prior to joining TRS Advisors, I was a member of the restructuring advisory group at Rothschild & Co. During the course of my career, I have been involved in numerous significant chapter 11 cases, including, among others: GTT Communications, Inc.;

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Lifesize, Inc. (5803); SL Midco 1, LLC (6980), SL Midco 2, LLC (9192); Serenova, LLC (9208); Telstrat, LLC (5255); LO Platform Midco, Inc. (5738); Serenova WFM, Inc. (2823); and Light Blue Optics, Inc. (7669). The Debtors' service address is 216 W. Village Blvd., Laredo, TX 78041.

.

Frontier Communications Corp.; Nine West Holdings, Inc.; Pyxus International, Inc.; Weatherford International plc; Windstream Holdings, Inc.; GWG Holdings, Inc.; and Loyalty Ventures, Inc. I have a B.S. from Leonard N. Stern School of Business, New York University.

2.      I submit this declaration (the "<u>Declaration</u>") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "<u>DIP Motion</u>"), filed concurrently herewith, of the Debtors for entry of interim and final orders: (a) authorizing the Debtors to obtain postpetition financing, (b) authorizing the Debtors' use of cash collateral, (c) granting liens and superpriority administrative claims, and (d) granting adequate protection to certain prepetition secured parties, among other relief.

3.      Except as otherwise indicated herein, the facts set forth in this declaration (this "<u>Declaration</u>") are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of or advisors to the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. I am not being specifically compensated for this testimony other than through payments received by Piper Sandler, as engaged by the Debtors; none of those payments are specifically payable on account of this testimony. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      A detailed description of the Debtors' business and facts precipitating the filing of the Debtors' chapter 11 proceedings are set forth in the *Declaration of Marc Bilbao in Support of*

*Debtors' Chapter 11 Petitions and First Day Relief* filed contemporaneously with this Declaration, incorporated here by reference.[2]

5.      To ensure that the secured debtor-in-possession financing offered to the Company by First-Citizens Bank & Trust Company (successor by purchase to the Federal Deposit Insurance Corporation as Receive for Silicon Valley Bridge Bank, N.A. (as successor Silicon Valley Bank) ("SVB" and the "DIP Loan") represents the optimal terms for post-petition financing available to the Company under the present circumstances, I undertook an examination of the marketplace for post-petition financing.

6.      In early May 2023, Piper Sandler reached out to 24 parties seeking debtor-in-possession financing proposals commensurate with the terms and collateral package, including the priming of prepetition liens, as proposed by the DIP Loan. The parties were selected utilizing Piper Sandler's databases and were chosen because they provide capital solutions, primarily in the form of credit, to distressed middle market businesses and have, in the past, expressed interest in providing financing to debtors-in-possession. We asked those 24 parties to assume that SVB would consent to such a priming when we solicited proposals. Parties were made aware of the proposed stalking horse bid to pay approximately $21 million for substantially all assets of the Company.

7.      Of those 24 parties, only one signed a non-disclosure agreement to receive additional materials regarding the Company and the potential financing opportunity. Ultimately, we received no proposals from any of the 24 parties. Given this process, and the underlying facts surrounding these Chapter 11 Cases, we believe that the DIP Loan's terms represent the best and likely only debtor-in-possession financing available in the marketplace for the Company at present.

---

[2]      Capitalized terms not defined in this Declaration have the meanings ascribed to them in the First Day Declaration.

8. None of the 24 parties we solicited proposals from submitted a proposal even if such proposal contemplated priming SVB. This is due, in our view, to limited available collateral, size of the financing needed, and the challenges of providing priming financing in an accelerated timeline. These factors likely resulted in parties passing on the opportunity.

9. Because we were unable to elicit any proposals for third-party financing on a priming basis, we believe, based on our experience, that it would have been futile for us to seek financing on a junior basis where the third-party financing would be secured by liens subordinate to existing prepetition liens securing prepetition debt of at least approximately $80 million. In our experience, lenders would perceive a lack of collateral, especially because a loan junior to $80 million of prepetition secured debt where the stalking horse buyer proposes to pay approximately $21 million for substantially all the prepetition lenders' collateral would be untenable. And because the Company does not have material unencumbered assets to secure third-party debtor-in-possession financing, neither junior nor *pari passu* financing would ever be available.

10. Based on our experience as a restructuring professional and involvement in the process described above, it is clear to us that the Company's best and likely only available path to financing for its Chapter 11 case was to accept the DIP Loan offered by SVB. As noted above, no party Piper Sandler contacted was interested in providing, or willing to provide, post-petition financing to the Debtors on a priming basis, much less a junior or unsecured basis. Given the financing efforts and process described above and based on our experience as a restructuring professional and involvement in other financing transactions, we believe that the DIP Facility is

the best financing option presently available to the Debtors and that the terms of the DIP Loan are in the best interests of the estates.

Dated: May 16, 2023

/s/ James Kang
JAMES KANG