**<u>Exhibit A</u>**

**Bilbao Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| LIFESIZE, INC. *et al.*, | Case No. 23-50038 (DRJ) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF MARC BILBAO IN SUPPORT OF DEBTORS' APPLICATION FOR AUTHORITY TO (I) EMPLOY AND RETAIN FTI CONSULTING, INC., (II) DESIGNATE MARC BILBAO AND MICHAEL YOSHIMURA TO SERVE AS CO-CHIEF RESTRUCTURING OFFICERS, AND (III) PROVIDE ADDITIONAL PERSONNEL FOR DEBTORS**

Pursuant to 28 U.S.C. § 1746, Marc Bilbao declares as follows:

1.      I am a Senior Managing Director with FTI Consulting, Inc. ("FTI"), which has a place of business at 350 S. Grand Avenue, Suite 3000, Los Angeles, CA 90071, among other locations.

2.      I submit this declaration on behalf of FTI in support of the *Debtors' Application for Authority to (I) Employ and Retain FTI Consulting, Inc., (II) Designate Marc Bilbao and Michael Yoshimura as Co-Chief Restructuring Officers, and (III) Provide Additional Personnel for Debtors* (the "Application").[2] Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Lifesize, Inc. (5803); SL Midco 1, LLC (6980), SL Midco 2, LLC (9192); Serenova, LLC (9208); Telstrat, LLC (5255); LO Platform Midco, Inc. (5738); Serenova WFM, Inc. (2823); and Light Blue Optics, Inc. (7669). The Debtors' service address is 216 West Village Blvd., Suite 102, Laredo, TX 78041.

[2]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Application.

## FTI's QUALIFICATIONS

3.      FTI has a wealth of experience in providing interim management services and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors throughout the United States.

4.      FTI professionals have provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to the Debtors' chapter 11 cases. FTI has provided financial and/or crisis management services in numerous large cases in this district. *See, e.g., In re Mountain Express Oil Company*, *et al.*, Case No. 23-90147 (Bankr. S.D. Tex.); *In re Diamond Sports Group*, Case No. 23-90116 (Bankr. S.D. Tex.); *In re IEH Auto Parts Holding LLC, et al.*, Case No. 23-90054 (Bankr. S.D. Tex.); *In re HONX, Inc.*, No. 22-90035 (Bankr. S.D. Tex.); *Party City Holdco, Inc.*, Case No. 23-90005 (Bankr. S.D. Tex.); *In re Entrust Energy, Inc.*, No. 21-31070 (Bankr. S.D. Tex.); *In re Pipeline Health System, LLC*, Case No. 22-90291 (Bankr. S.D. Tex.); *In re GWG Holdings, Inc.*, Case No. 22-90032 (Bankr. S.D. Tex.); *In re Serta Simmons Bedding, LLC*, Case No. 23-90020 (Bankr. S.D. Tex.); *In re Sungard Availability Services Ltd.*, Case No. 22-90026 (Bankr. S.D. Tex.); *In re Cineworld Group PLC*, Case No. 22-90168 (Bankr. S.D. Tex.); *In re Talen Energy Supply*, Case No. 22-90054 (Bankr. S.D. Tex.); *In re Brazos Electric Power Cooperative, Inc.*, Case No. 21-30725 (Bankr. S.D. Tex.); *In re SpeedCast International Limited*, Case No. 20-32243 (Bankr. S.D. Tex.); and *In re Neighbors Legacy Holdings, Inc.*, Case No. 18-33836 (Bankr. S.D. Tex.).

5.      I will act as Co-CRO for the Debtors. I have extensive experience which includes advising companies, creditors, shareholders and other interested parties on restructuring transactions both in chapter 11 and in non-bankruptcy driven resolutions. I have industry expertise

in commercial products, general industrial, financial services, healthcare, manufacturing, and retail, among other areas.

6.    My experience includes leading engagements where I have represented companies and creditors in formal and informal restructurings and advising clients, including companies and creditors, on structuring, negotiating, and refinancing various forms of debt and equity. I have over 25 years of experience in restructuring. I also co-lead FTI's West Region. I joined FTI from Imperial Capital, where I had been Co-Head of the Restructuring Group. Prior to that, I was a Managing Director in the Los Angeles office of Giuliani Capital Advisors and was a member of Giuliani Capital's Board of Managers and its Commitment Committee.  Prior to joining Giuliani Capital, I served as Executive Director in the Debt Restructuring and Workout Group of CIBC World Markets in New York. In addition, I have valued and sold companies in and outside of chapter 11, advised acquirers of such companies, and identified, analyzed, and recommended strategic and financial alternatives thereto. I have extensive experience leading Debtor clients through Chapter 11 cases and 363 asset sale processes.

7.    A representative list of my client experience includes Hytera Communications, National Stores, Bertucci's Holdings, Inc., A.M. Castle & Co., Sonifi Solutions, Zelenka Farms, American Suzuki Motor Corp, Contessa Foods, AFA Foods, Specialty Trust,  Real Mex Restaurants, Solyndra, Inc., Aloha Airlines, and Fairfield Residential.

8.    The additional individuals from FTI who will work alongside me (together, with myself, the "FTI Professionals") have substantial expertise in the areas discussed above, and, if approved, will provide services to the Debtors in accordance with the Engagement Letter, attached hereto as **Schedule 3**, and applicable orders of the Court. The FTI Professionals will work closely with the Debtors' management and professionals throughout the reorganization process. By virtue

of the expertise of its restructuring personnel, FTI is well qualified to provide services to and represent the Debtors' interests in these chapter 11 cases.

9.     FTI performed significant prepetition work for the Debtors and, as a result, has acquired significant knowledge of the Debtors and their businesses and familiarity with the Debtors' financial affairs, capital structure, operations, and related matters. Likewise, in providing prepetition services to the Debtors, FTI's professionals have worked closely with the Debtors' management and their other advisors. Accordingly, FTI has experience, expertise, and specifically relevant knowledge regarding the Debtors that will assist it in providing effective and efficient services in these chapter 11 cases. I submit that the designation of myself and Mr. Yoshimura as Co-CROs and the retention of FTI on the terms and conditions set forth herein are necessary and appropriate, in the best interests of the Debtors' estates, creditors, and all other parties in interest, and should be granted in all respects.

### SERVICES TO BE RENDERED

10.     FTI will provide restructuring oversight through the designation of the Co-CROs, consistent with a scope of duties typical of such interim management positions. Generally, the Co-CROs, reporting directly to the Board, and FTI will perform services to assist the Debtors throughout the Debtors' chapter 11 process. Working collaboratively with the senior management team, CEO, and other Debtors' professionals, FTI, Mr. Yoshimura and I will assist the Debtors with evaluating and implementing strategic and tactical options through the restructuring process. In addition to the ordinary course of duties of a Co-CROs, the FTI Professionals may work with the Debtors to do the following, among others:

- Assist with preparation of voluntary petitions and exhibits for each entity that may commence a case under chapter 11 of the Bankruptcy Code;

- Prepare internal employee communications;

- Assist with preparation of 2nd day motions;

- Develop the Debtors' matrix of creditors;

- Negotiate with critical vendors to help maintain business continuity;

- Respond to data requests from interested parties;

- Assist the Debtors in the development or refinement of a 13/26-week cash flow forecast and any associated debtor-in-possession financing forecast;

- Provide the Debtors with strategic communication services in connection with the overall restructuring;

- Advise the Debtors in other post-filing operational activities including accounting cut-off and payment controls among others;

- Assist with development of monthly operating reports and any other necessary financial disclosures required in connection with any chapter 11 cases for the Debtors;

- Identify accounting system capabilities for pre/post filing cut off and on-going implementation of cut-off processes;

- Prepare Statements of Financial Affairs and Schedules of Assets and Liabilities for each Debtor;

- Develop and monitor claims data base including analysis of claims for accuracy, entity and classification;

- Assist with the development of emergence accounting protocols and statement;

- Prepare external communications and press releases as they relate to the Bankruptcy Case;

- Assist the Debtors' ongoing asset sales/ investment process

**NO DUPLICATION OF SERVICES**

11.    FTI understands that the Debtors may retain additional professionals during the term of its engagement and will work cooperatively with such professionals to integrate any respective work conducted by the professionals on behalf of the Debtors. The services provided by FTI will complement, and not duplicate, the services to be rendered by any other professional retained in these chapter 11 cases.

DOCS_LA:349204.6 52624/002

## TERMS OF RETENTION

12.     FTI's decision to accept this engagement is conditioned upon its ability to be retained in accordance with its customary terms and conditions of employment, compensated for its services, and reimbursed for the out-of-pocket expenses it incurs in accordance with its customary billing practices, as set forth in the Engagement Letter.

13.     The terms and conditions set forth in the Engagement Letter, which are similar to the terms and conditions FTI offers to similar clients for similar services, are reasonable.

14.     FTI will be compensated for its services to the Debtors based on the Engagement Letter, which provides that FTI's services described above, including my services and those of Michael Yoshimura as co-CROs, will be compensated on a post-petition basis at a flat monthly fee of $250,000, as more fully set forth in the Engagement Letter. Any other services, including any testimony at court hearings as described below and in the Engagement Letter, will be charged at FTI's current standard hourly rates, which are as follows:

| Title | Hourly Rate |
|---|---|
| Senior Managing Directors | $1,125 - $1,495 |
| Directors / Senior Directors / Managing Directors | $835 - $1,055 |
| Consultants/Senior Consultants | $475 - $750 |
| Administrative / Paraprofessionals | $175 - $325 |

15.     In addition to the fees outlined above, FTI will bill for reasonable, documented, out-of-pocket, direct expenses which are likely to be incurred on your behalf during this Engagement. Direct expenses include reasonable and customary out-of-pocket expenses which are billed directly to the engagement such as internet access, telephone, overnight mail, messenger,

client approved travel, meals, accommodations and other expenses specifically related to this engagement.

16.     Further, if FTI and/or any of its employees are required to testify or provide evidence at or in connection with any judicial or administrative proceeding relating to this matter, FTI will be compensated at its regular hourly rates and reimbursed for reasonable allocated and direct expenses (including counsel fees) with respect thereto.

17.     The Fee and Expense Structure is consistent with and typical of compensation arrangements entered into by FTI and other comparable firms that render similar services under similar circumstances. I believe that the Fee and Expense Structure is reasonable, market-based, and designed to compensate FTI fairly for its work and to cover fixed and routine overhead expenses.

18.     To the extent FTI uses the services of independent contractors (the "Contractors") in these chapter 11 cases, FTI will: (a) pass through the cost of such Contractors to the Debtors at the same rate that FTI pays the Contractors; (b) seek reimbursement for actual costs only; (c) ensure that the Contractors are subject to the same conflict checks as required for FTI; and (d) file with the Court such disclosures required by Bankruptcy Rule 2014.

19.     To the extent FTI requires the services of its international divisions or personnel from specialized practices, the standard hourly rates for that international division or specialized practice will apply.

20.     FTI intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these chapter 11 cases consistent with the Fee and Expense Structure, subject to this Court's approval and in compliance with applicable

provisions of the Bankruptcy Code, including Bankruptcy Code section 328, the Bankruptcy Rules, the Bankruptcy Local Rules, and any other applicable procedures and orders of this Court.

21.     FTI and I will also maintain records in support of any fees, costs, and expenses incurred in connection with services rendered in these chapter 11 cases. Records will be arranged by category and nature of the services rendered and will include reasonably detailed descriptions of those services provided on behalf of the Debtors.

22.     Pursuant to the Engagement Letter, FTI received a retainer in the total amount of $50,000 from the Debtors on March 6, 2023 (the "Retainer"). According to FTI's books and records, during the ninety (90) days before the Petition Date, the Debtors paid FTI $667,913.00, inclusive of the retainer payment, in the aggregate for professional services performed and expenses incurred, including the Retainer and advanced payments. The Debtors do not owe FTI any sums for prepetition services.

## INDEMNIFICATION PROVISIONS

23.     The Engagement Letter contains standard indemnification language with respect to FTI's services including, without limitation, an agreement by the Debtors to indemnify FTI and its affiliates, partners, directors, officers, employees and agents, as well as myself (each, an "FTI Party") from and against all claims, liabilities, losses, expenses, and damages arising out of or in connection with the engagement of FTI that is the subject of the Engagement Letter, except to the extent caused by gross negligence, willful misconduct, or fraud of any FTI Party.

24.     The indemnification provisions contained in the Engagement Letter (the "Indemnification Provisions") are customary and reasonable for FTI and comparable firms providing financial advisory services. The terms and conditions of the Indemnification Provisions were negotiated by the Debtors and FTI at arm's length and in good faith. I believe that the

8

provisions contained in the Engagement Letter, viewed in conjunction with the other terms of FTI's proposed retention, are reasonable and in the best interest of the Debtors, their estates, and creditors in light of the fact that the Debtors require FTI's services to successfully reorganize.

25.     Notwithstanding the foregoing, I understand that the Indemnification Provisions will apply only to such FTI employees not serving in executive officer positions and that the indemnification of any persons serving as executive officers will be on the same terms as provided to the Debtors' other officers and directors under the corporate bylaws and applicable state law, along with insurance coverage under the Debtors' directors and officers insurance policy. The indemnification terms herein supersede and replace any provision of the Engagement Letter related to the indemnification of any executive officers including, but not limited to, the applicable provisions of Section 6 of the Standard Terms and Conditions of the Engagement Letter.

26.     I believe that with respect to any persons not serving in executive officer positions, this Court approve the Indemnification Provisions as set forth in the Engagement Letter.

### FTI'S DISINTERESTEDNESS

27.     In connection with the preparation of this Declaration, FTI conducted a review of its contacts with the Debtors, their affiliates, and certain entities holding large claims against or interests in the Debtors that were made reasonably known to FTI. A listing of the parties reviewed is reflected **Schedule 1** to this Declaration. FTI's review, completed under my supervision, consisted of a query of the **Schedule 1** parties within an internal computer database[3] containing names of individuals and entities that are present or recent former clients of FTI. A summary of

---

[3]     For the avoidance of doubt, FTI's computer database covers FTI Consulting, Inc. and its wholly-owned subsidiaries globally.

such relationships that FTI identified during this process is set forth on **Schedule 2** to this Declaration.

28.     Based on the results of its review, FTI does not have a relationship with any of the parties on **Schedule 1** in matters related to the Debtors or these chapter 11 cases. FTI has provided and could reasonably be expected to continue to provide services unrelated to the Debtors' cases for the various entities shown on **Schedule 2**. FTI's assistance to these parties has been related to providing various financial restructuring, litigation support, technology, strategic communications, and economic consulting services. To the best of my knowledge and except as otherwise disclosed herein, no services have been provided to these parties in interest that involve their rights in the Debtors' cases, nor does FTI's involvement in these cases compromise its ability to continue such consulting services.

29.     As part of its diverse practices, FTI appears in numerous cases, proceedings, and transactions that involve many different professionals, including attorneys, accountants, and financial consultants, who may represent claimants and parties-in-interest in the Debtors' chapter 11 cases. Also, FTI has performed in the past, and may perform in the future, advisory consulting services for various attorneys and law firms, and has been represented by several attorneys and law firms, some of whom may be involved in these proceedings. In addition, FTI has in the past, may currently, and will likely in the future be working with or against other professionals involved in these chapter 11 cases in matters unrelated to the Debtors and these cases. Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these relationships create interests adverse to the Debtors in matters upon which FTI is to be employed and none are in connection with the Debtors' chapter 11 cases.

30.     FTI is not a "creditor" of any of the Debtors within the meaning of Bankruptcy Code section 101(10). Further, neither I, FTI, nor any other of the FTI Professionals serving the Debtors, to the best of my knowledge, (a) is a creditor, equity security holder, or insider of any of the Debtors; (b) except with respect to the prepetition officer role described herein, is or has been within two years before the Petition Date, a director, officer, or employee of any of the Debtors; or (c) has any interest materially adverse to the interest of the Debtors' estate or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason. As such, to the best of my knowledge and based upon the results of the relationship search described above and disclosed herein, FTI (i) is a "disinterested person" as defined in Bankruptcy Code section 101(14) and (ii) neither holds nor represents an interest adverse to the Debtors or their estates. Therefore, FTI believes it is eligible to represent the Debtors under Bankruptcy Code section 327(a).

31.     It is FTI's policy and intent to update and expand its ongoing relationship search for additional parties in interest in an expedient manner. If any new material relevant facts or relationships are discovered or arise, FTI will file a supplemental declaration under Bankruptcy Rule 2014.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 13, 2023                                    */s/ Marc Bilbao*
                                                        Marc Bilbao

**SCHEDULE 1**

**SCHEDULE 1**

| Category | Parties-in-Interest |
|---|---|
| Equity Holders | Marlin SL Topco, LP |
| | Marlin LO Holdings, LP |
| | Marlin Heritage, LP |
| | Marlin Heritage II, LP |
| U.S. Trustee Personnel, Judges & Court Contacts (& Key Staff Members) | Albert Alonzo |
| | Alicia McCullar |
| | Ana Castro |
| | Aubrey Thomas |
| | Barbara Griffin |
| | Chief Judge David R. Jones |
| | Christy Simmons |
| | Clarissa Waxton |
| | Darlene Hansen |
| | David J. Bradley |
| | Eduardo V. Rodriguez |
| | Glenn Otto |
| | Gwen Smith |
| | Hector Duran |
| | Henry G. Hobbs, Jr. |
| | Jacqueline Boykin |
| | Jana Whitworth |
| | Jayson B. Ruff |
| | Jeannie Andresen |
| | Jeannie Chavez |
| | Judge Christopher M. Lopez |
| | Judge Eduardo V. Rodriguez |
| | Judge Jeffrey P. Norman |
| | Judge Marvin Isgur |
| | Kimberly Picota |
| | Linda Motton |
| | LinhThu Do |
| | Luci Johnson-Davis |
| | Mario Rios |
| | Nathan Ochsner |
| | Patricia Schmidt |
| | Rosario Saldana |
| | Southern District of Texas |
| | Stephen Statham |
| | Tracey Conrad |
| | Tyler Laws |
| | Vriana Portillo |
| Bankruptcy Professionals | Kurtzman Carson Consultants (KCC) LLC |
| | FTI Consulting, Inc. |

1

|  | Piper Sandler & Co. |
|---|---|
| Banks/Lender/UCC Lien Parties/Administrative Agents | Silicon Valley Bank<br>First Citizens Bank<br>Bank of America<br>Cliffwater<br>Columbia Lake Partners Growth Lending I (LUXCO) S.A.R.L.<br>Employment Development Department<br>SVB Innovation Credit Fund VIII, L.P.<br>Technology Finance Corporation<br>Dell Financial Services LLC<br>De Lage Landen Financial Services, Inc.<br>Marlin LO Holdings LP<br>Hewlett-Packard Financial Services Company |
| Competitors | Talkdesk<br>Five9 Inc. |
| Current Board of Directors | Greg Ruffini<br>Ryan Wald |
| Current Officers | Marc Bilbao<br>Michael Yoshimura |
| Insurance Providers/Insurance Brokers | Lockton Companies LLC<br>CNA Insurance<br>IPFS Insurance<br>Valley Forge Insurance Company<br>Continental Insurance Company<br>AXA XL<br>Westchester Fire Insurance Co.<br>Endurance American Specialty Insurance Company |
| Parties to Litigation | Lockton Companies LLC<br>IPFS Insurance<br>Valley Forge Insurance Company |
| Top 30 Unsecured Creditors | Logitech International, S.A.<br>Meritech Capital Lifesize LLC<br>Redpoint Omega II, LP<br>SH Lifesize, LLC<br>Craig Malloy<br>Silicon Valley Bank<br>Escalate Capital Partners SBIC III, LP<br>Calabrio, Inc<br>Tippet Lifesize, LLC<br>Oracle America, Inc.<br>Persistent Systems Limited<br>Blue Jeans Network, Inc.<br>Benchmark Electronics (M) SDN BHD<br>Twilio Inc. |

2

|  | Michael Helmbrecht |
|  | Appsmart Agent Services, Inc. |
|  | Radianz Americas Inc. |
|  | Tom Cameron |
|  | Clayton Reed |
|  | Focus Services LLC |
|  | InsightSoftware, LLC |
|  | BCM Advanced Research |
|  | Bobby Beckmann |
|  | ValueLabs Inc |
|  | Enoch Kever PLLC |
|  | Redpoint Omega Associates II, LLC |
|  | Brandywine Realty Trust |
|  | Farnam Street Financial, Inc. |
| Debtors | LifeSize, Inc. |
|  | SL Midco 1, LLC |
|  | SL Midco 2, LLC |
|  | Serenova, LLC |
|  | Telstrat, LLC |
|  | LO Platform Midco, Inc. |
|  | Serenova WFM, Inc. |
|  | Light Blue Optics, Inc. |
| Former Names of Debtors | LiveOps Cloud Platform, LLC |
| Non-Debtors | Lifesize Technologies UK Ltd |
|  | Lifesize Italia SRL |
|  | LiveOps Cloud Platform Canada, Inc |
|  | Lifesize India Pvt. Ltd. |
|  | Lifesize France SARL |
|  | LiveOps UK LTD. |
|  | Lifesize GmbH |
|  | Loxysoft WFM AB |
|  | LiveOps New Zealand Ltd. (NZ) |
|  | Lifesize Japan K.K. |
|  | Lifesize Australia PTY. LTD. |
|  | Lifesize Singapore Pte. Ltd |
|  | Lifesize India Pvt. Ltd. |
| Other Parties | Enghouse Systems Ltd |
|  | Enghouse Interactive, Inc. |
| Governmental Units | Federal Communications Commission |
| Major Benefits Administrators or Additional Third-Party Administrators | Automatic Data Processing, Inc. (ADP) |
|  | Avalara |
|  | Celeritas Business Solutions LLP |

**SCHEDULE 2**

**Schedule 2**

As FTI Consulting, Inc. is the only FTI entity being retained, only disclosures as to it are relevant to the retention application. For purposes of transparency, however, disclosure as to all FTI affiliates is provided. All disclosures below are for matters unrelated to the Debtors, their affiliates, or the Chapter 11 Cases. For all disclosures concerning relationships that generate revenue, such revenue is less than 1% of the annual revenue of FTI and its affiliates. For all disclosures concerning relationships where the named person or entity is a vendor of FTI and its affiliates, such person or entity is not a critical vendor.

| Individual / Entity | Relationship to Debtors | Relationship to FTI Consulting, Inc. & Affiliates |
|---|---|---|
| LifeSize, Inc.<br>Light Blue Optics, Inc.<br>LO Platform Midco, Inc.<br>Serenova WFM, Inc.<br>Serenova, LLC<br>SL Midco 1, LLC<br>SL Midco 2, LLC<br>Telstrat, LLC | Debtors | Current clients on pre-petition work |
| Amazon Web Services, Inc.<br>DLA Piper LLP (US) | Top 30 Unsecured Creditors | Current clients |
| AXA XL<br>CNA Insurance<br>Continental Insurance Company<br>Endurance American Specialty Insurance Company<br>Westchester Fire Insurance Co. | Insurance Providers/Insurance Brokers | Current clients |
| Azets | Major Benefits Administrators or Additional Third-Party Administrators | Current client |
| Bank of America<br>CIT Bank, N.A.<br>PNC Bank<br>Wells Fargo | Banks/Lender/UCC Lien Parties/Administrative Agents | Current clients |
| Logitech International S.A. | Former Names of Debtors | Current clients |
| Morrison & Foerster LLP | Other Parties | Current clients |
| Pachulski Stang Ziehl & Jones | Bankruptcy Professionals | Current clients |

**SCHEDULE 3**
(Engagement Letter)



<u>CONFIDENTIAL</u>

April 11, 2023

Greg Ruffini
Lifesize, Inc.
P.O. Box 161180
Austin, TX 78716

**Re:  Chief Restructuring Officer Services for Lifesize, Inc.**

Dear Mr. Ruffini:

The purpose of this letter is to confirm the understanding and agreement (the "Agreement") between Marlin-SL Midco 1, LLC and its direct and indirect subsidiaries (the "Client" or "Lifesize") and FTI Consulting, Inc. ("FTI") concerning the Client's engagement of FTI to provide certain temporary employees to the Client for Chief Restructuring Officer services (the "Services"). This Agreement is effective on April 11, 2023 (the "Effective Date"). The FTI Standard Terms and Conditions attached hereto as Exhibit "A" are also incorporated herein and forms part of this Agreement.

## 1.   <u>Temporary Officers, Hourly Temporary Employees and Services</u>

FTI will provide Marc Bilbao and Michael Yoshimura to serve as the Client's co-Chief Restructuring Officers (each a "Co-CRO" or "CRO", and collectively the "Temporary Officers" or "Co-CROs") reporting to the board of directors for Marlin-SL Midco 1, LLC (the "Board"), or a committee to whom appropriate authority has been delegated by the Board in connection with the Engagement (the "Committee"). The Temporary Officers, as well as any additional Temporary Staff (as defined below), shall have such duties as the Board may from time to time determine, and shall at all times report to and be subject to supervision by the Board. Without limiting the foregoing, the Temporary Officers, as well as any Temporary Staff, shall work with other senior management of the Client, and other professionals, to provide the Services. Acceptance of the CRO positions by Mr. Bilbao and Mr. Yoshimura is subject to (a) confirmation that they would be covered by a sufficient Directors and Officers Liability policy through the Company and that such policy is maintained and applicable to Mr. Bilbao and Mr. Yoshimura during the duration of this engagement and (b) agreement that the Company will purchase a tail for such policy, for no less than three (3) years, by April 30, 2023 or another date mutually agreed upon with FTI.  Prior to these conditions being met, Mr. Bilbao and Mr. Yoshimura shall be Temporary Staff.

In addition to providing the Temporary Officers, FTI may also provide the Client with additional staff (the "Temporary Staff" and, together with the Temporary Officers, the "FTI Professionals"), subject to the terms and conditions of this Agreement. The Temporary Staff may be assisted by or replaced by other FTI professionals reasonably satisfactory to the Board and/or Committee, as required, who shall also become Hourly Temporary Staff for purposes hereof.  The initial schedule of Hourly Temporary Staff is set out on Exhibit "B".   FTI will keep the Board reasonably informed as to FTI's staffing and must receive written approval by the Board in writing in advance to add additional Temporary Staff.

If cases under the Bankruptcy Code are commenced (the "Bankruptcy Cases"), and our retention is approved, our role will include serving as principal bankruptcy financial advisors to the debtors and debtors in possession in those cases under a general retainer, subject to court approval.  Our role also will encompass all out-of-court planning and negotiations attendant to these tasks.

The engagement of FTI to perform the Services during the Bankruptcy Cases shall be subject to the

approval of the Bankruptcy Court and shall be substantially as provided in this Agreement as modified by the retention order approved by the Bankruptcy Court. Client agrees, at Client's expense, to file an application (the "Application") to employ FTI as crisis and turnaround manager *nunc pro tunc* to the Effective Date pursuant to § 363 of the Bankruptcy Code. The Client agrees to file all required applications, including the Application, for the employment or retention of FTI at the earliest practical time.

The services we will provide in connection with the Engagement will encompass all services normally and reasonably associated with this type of engagement that we are requested and are able to provide and that are consistent with our ethical obligations.  With respect to all matters of our Engagement, we will coordinate closely with the Company as to the nature of the services that we will render and the scope of our engagement.

As usual, our Engagement is to represent the Company and not its individual directors, officers, employees or shareholders.  However, we anticipate that in the course of that Engagement, we may provide information or advice to directors, officers or employees in their corporate capacities.

The Services do not include (i) audit, legal, tax, environmental, accounting, actuarial, employee benefits, insurance advice or similar specialist and other professional services which are typically outsourced and which shall be obtained directly where required by the Client at Client's expense; or (ii) investment banking, including valuation or securities analysis, including advising any party or representation of the Client on the purchase, sale or exchange of securities or representation of the Client in securities transactions. FTI is not a registered broker-dealer in any jurisdiction and will not offer advice or its opinion or any testimony on valuation or exchanges of securities or on any matter for which FTI is not appropriately licensed or accredited. An affiliate of FTI is a broker-dealer but is not being engaged by the Client to provide any investment banking or broker-dealer services. The Client agrees to supply office space, and office and support services to FTI as reasonably requested by FTI in connection with the performance of its duties hereunder.

## 2.      <u>Compensation to FTI</u>

Fees for services rendered in connection with this assignment will be based upon the time incurred providing the services, multiplied by a blended hourly rate of $585 (USD) until the Client directs the FTI Professionals in writing to begin preparations for a filing of any Client subsidiary under the Bankruptcy Code. Thereafter, the Client agrees to pre-pay FTI a monthly, non-refundable advisory fee of $275,000 for the first month and $250,000 for each subsequent month for the services of the FTI Professionals (the "Monthly Advisory Fee"); provided that any fee owing to a period, or portion thereof, during which the FTI Professionals are not required to provide services shall be cancelled or refunded as the case may be, on a pro rated basis for services actually rendered. For the avoidance of doubt, the Monthly Advisory Fee includes the services of both the Co-CROs and the Temporary Staff.

In addition to the fees outlined above, FTI will bill for reasonable, documented, out-of-pocket, direct expenses which are likely to be incurred on your behalf during this Engagement.  Direct expenses include reasonable and customary out-of-pocket expenses which are billed directly to the engagement such as internet access, telephone, overnight mail, messenger, client approved travel, meals, accommodations and other expenses specifically related to this engagement.  Further, if FTI and/or any of its emloyees are required to testify or provide evidence at or in connection with any judicial or administrative proceeding relating to this matter, FTI will be compensated by you at its regular hourly rates and reimbursed for reasonable allocated and direct expenses (including counsel fees) with respect thereto.  Any hiring of third parties or counsel, and any expense item exceeding $250 must receive written approval in advance by the Company except to the extent travel is necessary to and from Bankruptcy Court, which will be subject to



court approval.

The Company agrees to promptly notify FTI if the Company or any of its subsidiaries extends (or solicits the possible interest in receiving) an offer of employment to a principal or employee of FTI involved in this Engagement and agrees that FTI has earned and is entitled to a cash fee, upon hiring, equal to 150% of the aggregate first year's annualized compensation, including any guaranteed or target bonus and equity award, to be paid to FTI's former principal or employee that the Company or any of its subsidiaries hires at any time up to one year subsequent to the date of the final invoice rendered by FTI with respect to this Engagement.

**Cash on Account:**

FTI will transfer the funds held on account pursuant to the Engagement Contract dated March 3, 2023 between the Company and FTI, which funds will be held "on account" to be applied to our professional fees, charges and disbursements for the Engagement (the "Initial Cash on Account"). To the extent that this amount exceeds our fees, charges and disbursements upon the completion of the Engagement, we will refund any unused portion. The Company agrees to increase or supplement the Initial Cash on Account from time to time during the course of the Engagement in such amounts as the Company and we mutually shall agree are reasonably necessary to increase the Initial Cash on Account to a level that will be sufficient to fund Engagement fees, charges, and disbursements to be incurred.

We will send the Company a monthly invoice for services to be rendered for the upcoming month and any direct charges and disbursements incurred in prior periods on the basis discussed above. Each invoice constitutes a request for an interim payment against the fee to be determined at the conclusion of our Services. Upon transmittal of the invoice, we may immediately draw upon the Initial Cash on Account (as replenished from time to time) in the amount of the invoice. The Company agrees that invoices are due upon receipt and will promptly wire the invoice amount to us as replenishment of the Initial Cash on Account (together with any supplemental amount to which we and the Company mutually agree), without prejudice to the Company's right to advise us of any differences it may have with respect to such invoice. We have the right to apply to any outstanding invoice (including amounts billed prior to the date hereof), up to the remaining balance, if any, of the Initial Cash on Account (as may be supplemented from time to time) at any time subject to (and without prejudice to) the Company's opportunity to review our statements.

In a case under the Bankruptcy Code, fees and expenses may not be paid without the express prior approval of the bankruptcy court. In most cases of this size and complexity, on request of a party in interest, the bankruptcy court permits the payment of interim fees during the case. The Company agrees that, if asked to do so by us, the Company will request the bankruptcy court to establish a procedure for the payment of interim fees during the case that would permit payment of interim fees. If the bankruptcy court approves such a procedure, we will submit invoices on account against our final fee. These interim invoices will be based on such percentage as the bankruptcy court allows of our internal time charges and costs and expenses for the work performed during the relevant period and will constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of our representation.

In preparation for the filing of any cases under the Bankruptcy Code, we also may require an additional on account payment to supplement the Initial Cash on Account to cover fees, charges and disbursements to be incurred during the initial phase of the chapter 11 cases (the "Additional Cash on Account"). We will hold the Additional Cash on Account, as we have the Initial Cash on Account. Of course, the reasonableness of the Additional Cash on Account remains subject to review by the court in any ensuing case.

3



If any of the Company's entities become a debtor in one or more cases under the Bankruptcy Code, some fees, charges, and disbursements (whether or not billed) incurred before the filing of bankruptcy petitions (voluntary or involuntary) might remain unpaid as of the date of the filing.  The unused portion, if any, of the Initial Cash on Account and the Additional Cash on Account will be applied to any such unpaid pre-petition fees, charges and disbursements.  Any requisite court permission will be obtained in advance. We will then hold any portion of the Initial Cash on Account and the Additional Cash on Account not otherwise properly applied for the payment of any such unpaid pre-filing fees, charges and disbursements (whether or not billed) as on account cash to be applied to our final invoice in any case under the Bankruptcy Code.

Post-petition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the court.  The Company understands that while the arrangement in this paragraph may be altered in whole or in part by the bankruptcy court, the Company shall nevertheless remain liable for payment of court approved post-petition fees and expenses.  Such items are afforded administrative priority under 11 U.S.C. § 503(b)(l). The Bankruptcy Code provides in pertinent part, at 11 U.S.C. § 1129(a)(9)(A), that a plan cannot be confirmed unless these priority claims are paid in full in cash on the effective date of any plan (unless the holders of such claims agree to different treatment).  It is agreed and understood that the unused portion, if any, of the Initial Cash on Account (as may be supplemented from time to time) and the Additional Cash on Account shall be held by us and applied against the final fee application filed and approved by the court.

Additional Provisions Regarding Fees:

a)   FTI may stop work or terminate the Agreement immediately upon the giving of written notice to the Client (i) if payments are not made in accordance with this Agreement, (ii) if the Application is not approved by the Bankruptcy Court, (iii) if the Chapter 11 case is dismissed or converted to a Chapter 7 proceeding, or (iv) if a Chapter 11 Trustee or other responsible person is appointed.

b)   If, and only if, local Bankruptcy rules or the order approving the Application so require, FTI shall file with and serve on creditors entitled to notice thereof, a statement of staffing, professional services, compensation or expenses, on a quarterly basis, or as the Bankruptcy Court or rules may direct, and creditors and other parties in interest shall have an opportunity to object thereto and request a hearing thereon. (ii) In the event that FTI is employed post-petition as a "professional person" pursuant to § 327 of the Bankruptcy Code, Bankruptcy Court approval will generally be required to pay FTI's fees and expenses for Post-petition Services. In most cases of this size and complexity, on request of a party in interest, the bankruptcy court permits the payment of interim fees during the case. The Client agrees that it will, at the Client's expense, request the Bankruptcy Court to establish a procedure for the payment of interim fees during the case that would permit payment of interim fees. If the Bankruptcy Court approves such a procedure, we will submit invoices on account against our final fee. These interim invoices will be based on such percentage as the bankruptcy court allows of our internal time charges and costs and expenses for the work performed during the relevant period and will constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of our Engagement.

c)   Any unpaid post-petition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the court. The Client understands that while the arrangement in this paragraph may be altered in whole or in part by the bankruptcy court, the Client shall nevertheless remain liable for payment of court approved post-petition fees and expenses. Such items are afforded administrative priority

4



under 11 U.S.C. § 503(b)(l). The Bankruptcy Code provides in pertinent part, at 11 U.S.C. § 1l29(a)(9)(A), that a plan cannot be confirmed unless administrative claims are paid in full in cash on the effective date of any plan (unless the holders of such claims agree to different treatment). It is agreed and understood that the unused portion, if any, of the Cash on Account shall be held by us and applied against the final fee application filed and approved by the court.

d) Client agrees that FTI is not an employee of the Client and the FTI employees and independent FTI contractors who perform the Services are not employees of the Client, and they shall <u>not</u> receive a W-2 from the Client for any fees earned under this engagement, and such fees are not subject to any form of withholding by the Client. The Client shall provide FTI a standard form 1099 on request for fees earned under this Engagement.

e) Copies of Invoices shall be sent by facsimile or email as follows:

<u>To the Client a</u>t:
Lifesize, Inc.
P.O. Box 161180
Austin, TX 78716

<u>Attention</u>: Amy Gamble agamble@lifesize.com


**3.    <u>Availability of Information</u>**

In connection with FTI's activities on the Client's behalf, the Client agrees (i) to furnish FTI with all information and data concerning the business and operations of the Client which FTI reasonably requests, and (ii) to provide FTI with reasonable access to the Client's officers, directors, partners, employees, retained consultants, independent accountants, and legal counsel. FTI shall not be responsible for the truth or accuracy of materials and information received by FTI under this agreement.

**4.    <u>Notices</u>**

Notices under this Agreement to the Client shall be provided as set forth in paragraph 2(e).

Notices to FTI shall be to:
350 S Grand Avenue, Suite 3000
Los Angeles, CA 90071
Attn: Marc Bilbao
Phone: +1 562.243.2323
Email: marc.bilbao@fticonsulting.com

Notices shall be provided by (a) email, (b) hand delivery, or (c) overnight delivery. If provided by email or hand delivery, they shall be deemed effective the date given. If provided by overnight delivery, they shall be deemed effective on the date of actual receipt.

**5.    <u>Miscellaneous</u>**

This Agreement: represents the entire understanding of the parties hereto and supersedes any and all other prior agreements among the parties regarding the subject matter hereof; shall be binding upon and inure to the benefit of the parties and their respective heirs, representatives, successors and assigns; may be executed by facsimile (followed by originals sent via regular mail), and in two or more counterparts, each



of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument; and may not be waived, modified or amended unless in writing and signed by a representative of the Client and FTI. The provisions of this Agreement shall be severable. No failure to delay in exercising any right, power or privilege related hereto, or any single or partial exercise thereof, shall operate as a waiver thereof.

Based on our understanding of the parties involved in this matter, we have compiled a list of interested parties (the "Potentially Interested Parties") and have undertaken a limited review of our records to determine FTI's professional relationships with the Company and such Potentially Interested Parties. From the results of such review, we are not aware of any conflicts of interest or relationships that we believe would preclude us from performing the Services.

As you know, however, we are a large consulting firm with numerous offices throughout the world.  We are regularly engaged by new clients, which may include one or more of the Potentially Interested Parties. The FTI professionals providing services hereunder will not accept an engagement that directly conflicts with this Engagement without your prior written consent.

If this letter correctly sets forth our understanding, please so acknowledge by signing below and returning a signed copy of this letter to us.

Very truly yours,

FTI CONSULTING, INC.

By: _____
Name: Marc Bilbao
Title: Senior Managing Director

ACCEPTED AND AGREED this __11__ day of April, 2023.

On behalf of Marlin-SL Midco 1, LLC and its direct and indirect subsidiaries,

By: _____
     Name: Greg Ruffini
     Title: Co-Manager

Date:_04/11/2023_____

6



# EXHIBIT A

# FTI CONSULTING, INC.

# STANDARD TERMS AND CONDITIONS

The following are the Standard Terms and Conditions on which we will provide the Services to you set forth within the attached letter of engagement with the Client dated as of April 11, 2023 (the "Engagement Letter"). The Engagement Letter and these Standard Terms and Conditions annexed thereto (collectively, the "Engagement Contract") form the entire agreement between us relating to the Services and replace and supersede any previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services.  The headings and titles in the Engagement Contract are included to make it easier to read but do not form part of the Engagement Contract.

**1.   Reports and Advice**

1.1      **Use and purpose of advice and reports—** Any advice given or report issued by us is provided solely for your use and benefit and only in connection with the purpose in respect of which the Services are provided. Unless required by law, you shall not provide any advice given or report issued by us to any third party, or refer to us or the Services, without our prior written consent, which shall be conditioned on the execution of a third party release letter in the form provided by FTI and attached hereto as Schedule A. In no event, regardless of whether consent has been provided, shall we assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

**2.   Information and Assistance**

2.1      **Provision of information and assistance** – Our performance of the Services is dependent upon you and the Company providing us with such information and assistance as we may reasonably require from time to time.

2.2      **Punctual and accurate information** – You and Company personnel shall use reasonable skill, care and attention to ensure that all information we may reasonably require is provided on a timely basis and is accurate and complete and relevant for the purpose for which it is required.  You and the Company shall also notify us if you subsequently learn that the information provided is incorrect or inaccurate or otherwise should not be relied upon.

2.3      **No assurance on financial data** – While our work may include an analysis of financial and accounting data, the Services will not include an audit, compilation or review of any kind of any financial statements or components thereof.  Company management will be responsible for any and all financial information they provide to us during the course of this Engagement, and we will not examine or compile or verify any such financial information.  Moreover, the circumstances of the Engagement may cause our advice to be limited in certain respects based upon, among other matters, the extent of sufficient and available data and the opportunity for supporting investigations in the time period.  Accordingly, as part of this Engagement, we will not express any opinion or other form of assurance on financial statements of the Company.

2.4      **Prospective financial information** - In the event the Services involve prospective financial information, our work will not constitute an examination or compilation, or apply agreed-upon procedures, in accordance with standards established by the American Institute of Certified Public Accountants or otherwise, and we will express no assurance of any kind on such information.  There will usually be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material.  We will take no responsibility for the achievability of results or events projected or anticipated by the management of the Company.

7



3.      **Additional Services**

3.1     **Responsibility for other parties**— You and the Company shall be solely responsible for the work and fees of any other party engaged by you or the Company to provide services in connection with the Engagement regardless of whether such party was introduced to you by us.  Except as provided in this Engagement Contract (including section 2 of the Engagement Letter with respect to the retention of certain agents and independent contractors), we shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters.  Further, we acknowledge that we are not authorized under our Engagement Contract to engage any third party to provide services or advice to you or the Company, other than our agents or independent contractors engaged to provide Services, without your or the Company's written authorization.

4.      **Confidentiality**

4.1     **Restrictions on confidential information**— All parties to this Engagement Contract agree that any confidential information received from the other parties shall only be used for the purposes of providing or receiving Services under this or any other contract between us. Except as provided below, no party will disclose other contracting party's confidential information to any third party without such party's consent. Confidential information shall not include information that:

4.1.1     is or becomes generally available to the public other than as a result of a breach of an obligation under this Clause 4.1;

4.1.2     is acquired from a third party who, to the recipient party's knowledge, owes no obligation of confidence in respect of the information; or

4.1.3     is or has been independently developed by the recipient (without the use of confidential information).

4.2     **Disclosing confidential information** – Notwithstanding Clause 1.1 or 4.1 above, all parties will be entitled to disclose confidential information to a third party to the extent that this is required by valid legal process, provided that (and without breaching any legal or regulatory requirement) where reasonably practicable not less than 2 business days' notice in writing is first given to the other parties.

4.3     **Citation of engagement** – Without prejudice to Clause 4.1 and Clause 4.2 above, to the extent our engagement is or becomes known to the public, we may cite the performance of the Services to our clients and prospective clients as an indication of our experience, unless we and you specifically agree otherwise in writing.

4.4     **Internal quality reviews** – Notwithstanding the above, we may disclose any information referred to in this Clause 4 to any other FTI entity or use it for internal quality reviews; *provided*, that we shall cause such persons to keep such information confidential in accordance with the terms of this Engagement Contract.

4.5     **Maintenance of workpapers** – Notwithstanding the above, we may keep one archival set of our working papers from the Engagement, including working papers containing or reflecting confidential information, in accordance with our internal policies; *provided*, that we shall keep such materials confidential in accordance with the terms of this Engagement Contract.

4.6     **Data Protection** - If this Engagement involves the processing of personal data (also referred to herein as personal information) (i) as governed by Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016, the terms of the EU Data Protection Schedule attached hereto as Schedule B shall apply to this engagement and it shall form an integral part of this Agreement and (ii) as governed by the California Consumer Privacy Act, the terms of the California Data Protection Schedule attached hereto as Schedule C shall apply to this engagement and it shall form an integral part of this Agreement. In the event of a conflict between the terms of this Agreement and the terms of Schedule B or Schedule C, the terms of Schedule B or Schedule C shall prevail in relation to the processing of such personal data. If such personal



data is processed in connection with this engagement, Client shall notify FTI in writing before any personal data is disclosed to FTI.

**5.    Termination**

5.1    **Termination of Engagement with notice**— Termination of Engagement with notice – Notwithstanding any termination by the Client or by FTI in the circumstances described in paragraph (a) under "Additional Provisions Regarding Fees" in the Engagement Letter, this Agreement is terminable by the Client or by FTI at any time upon the giving of thirty (30) days written notice. Upon such termination by the Client (the "Termination Date"), FTI shall cease work and the Client shall have no further obligation for fees and expenses of FTI arising or incurred after the Termination Date; , provided, however, that, the Client shall reimburse FTI for its out-of-pocket expenses (the "Termination Expenses") incurred in connection with commitments made by FTI prior to the Termination Date with respect to advance travel arrangements reasonably incurred, to the extent FTI is unable to obtain refunds of such expenses. FTI shall provide the Client with reasonable documentation to substantiate all Termination Expenses for which payment is requested.

5.2    **Continuation of terms**— The terms of the Engagement that by their context are intended to be performed after termination or expiration of this Engagement Contract, including but not limited to, Clauses 3 and 4 of the Engagement letter, and Clauses 1.1, 4, 6 and 7 of the Standard Terms and Conditions, are intended to survive such termination or expiration and shall continue to bind all parties.

**6.    Indemnification, Insurance and Liability Limitation**

6.1    **Indemnification –** The Company agrees to indemnify and hold harmless FTI and any of its subsidiaries and affiliates, officers, directors, principals, shareholders, agents, independent contractors and employees (collectively "Indemnified Persons") from and against any and all claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation) arising out of or relating to your retention of FTI, the execution and delivery of this Engagement Contract, the provision of Services or other matters relating to or arising from this Engagement Contract, except to the extent that any such claim, liability, obligation, damage, cost or expense shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Indemnified Person or Persons in respect of whom such liability is asserted  (an "Adverse Determination").  The Company shall pay damages and expenses, including reasonable legal fees and disbursements of counsel as incurred in advance.  FTI agrees that it will reimburse any amounts paid in advance to the extent they relate directly to an Adverse Determination.

Subject to any limitation post-petition required by the Bankruptcy Court, the Client agrees to indemnify and hold harmless FTI and its shareholders, directors, officers, managers, employees, contractors, agents and controlling persons (each, an "Indemnified Party") from and against any losses, claims, damages or expenses, or if same was or is or becomes a party to or witness or other participant in, or is threatened to be made a party to or witness or other participant in, any threatened, pending or completed action, suit, proceeding or alternative dispute resolution mechanism, or any hearing, inquiry or investigation, in each case by reason of (or arising in part out of) any event or occurrence related to this agreement or any predecessor agreement for services or the fact that any Indemnified Party is or was an agent, officer director, employee or fiduciary of the Client, or by reason of any action or inaction on the part of any Indemnified Party while serving in such capacity (an "Indemnifiable Event") against expenses (including reasonable attorneys' fees and disbursements), judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any Indemnifiable Event. The Application shall include the assumption by the Client of FTI's right to indemnification in respect of its actions under this Agreement prior to the Petition Date. The Indemnified Party shall promptly forward to the Client all written notifications and other matter communications regarding any claim that could trigger the Client's indemnification obligations under this Section 6. If the Client so elects or is requested by an Indemnified Party, the Client will assume the defense of such action or proceeding, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the reasonable fees and disbursements of such counsel. In the event, however, such Indemnified Party is advised by counsel that



having common counsel would present such counsel with a conflict of interest or if the defendants in, or targets of, any such action or proceeding include both an Indemnified Party and the Client, and such Indemnified Party is advised by counsel that there may be legal defenses available to it or other Indemnified Parties that are different from or in addition to those available to the Client, or if the Client fails to assume the defense of the action or proceeding or to employ counsel reasonably satisfactory to such Indemnified Party, in either case in a timely manner, then such Indemnified Party may employ separate counsel to represent or defend it in any such action or proceeding and the Client will pay the reasonable fees and disbursements of such counsel; provided, however, that the Client will not be required to pay the fees and disbursements of more than one separate counsel (in addition to local counsel) for an Indemnified Party in any jurisdiction in any single action or proceeding. In any action or proceeding the defense of which the Client assumes, the Indemnified Party will have the right to participate in such litigation and to retain its own counsel at such Indemnified Party's own expense. The Client further agrees that the Client will not, without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the Indemnified Party or any other Indemnified Party is an actual or potential party to such claim, action, suit or proceeding) unless (i) to the extent that such settlement, compromise or consent purports directly or indirectly to cover the Indemnified Party or any other Indemnified Party, such settlement, compromise or consent includes an unconditional release of the Indemnified Party and each other Indemnified Party from all liability arising out of such claim, action, suit or proceeding, or (ii) to the extent that such settlement, compromise or consent does not purport directly or indirectly to cover the Indemnified Party or any other Indemnified Party, the Client has given the Indemnified Party reasonable prior written notice thereof and used all reasonable efforts, after consultation with the Indemnified Party, to obtain an unconditional release of the other Indemnified Parties hereunder from all liability arising from all liability arising out of such claim, action, suit or proceeding. The Indemnified Party shall not enter into any closing agreement or final settlement that could trigger the Client's indemnification obligations under this Section 6 without the written consent of the Client, which shall not unreasonably be withheld or delayed or conditioned. The Client will not be liable for any settlement of any action, claim, suit or proceeding affected without the Client's prior written consent, which consent shall not be unreasonably withheld or delayed or conditioned, but if settled with the consent of the Client or if there be a final judgment for the plaintiff, the Client agrees to indemnify and hold harmless the Indemnified Party from and against any loss or liability by reason of such settlement or judgment, as the case may be.

6.2     **Insurance –**In addition to the above indemnification and provision regarding advancement of fees/expenses, FTI employees serving as directors or officers of the Company or its affiliates will receive the benefit of the most favorable indemnification and advancement provisions provided by the Company to its directors, officers and any equivalently placed employees, whether under the Company's charter or by-laws, by contract or otherwise.  The Company shall specifically include and cover employees and agents serving as directors and officers of the Company or affiliates from time to time with direct coverage under the Company's policy for liability insurance covering its directors, officers and any equivalently placed employees.  Prior to FTI accepting any director or officer position, the Company shall, at the request of FTI, provide FTI a copy of its current D&O policy, a certificate of insurance evidencing the policy is in full force and effect, and a copy of the signed board resolutions and any other document that FTI may reasonably request evidencing the appointment and coverage of the indemnitees.  The Company shall maintain such D&O insurance for the period through which claims can be made against such persons.  In the event the Company is unable to include FTI employees and agents under the Company's policy or does not have first dollar coverage acceptable to FTI in effect for at least $10 million, FTI may, subject to the prior written consent of the Company, attempt to purchase a separate D&O insurance  policy that will cover the FTI employees and agents only.  The cost of the policy shall be invoiced to the Company as an out-of-pocket expense.  Notwithstanding anything to the contrary, the Company's indemnification obligations in this Section 6 shall be primary to (and without allocation against) any similar indemnification and advancement obligations of FTI, its affiliates and insurers to the indemnitees (which shall be secondary), and the Company's D&O insurance coverage for the indemnitees shall be specifically primary to (and without allocation against) any other valid and collectible insurance coverage that may apply to the indemnitees (whether provided by FTI or otherwise).



This indemnity shall not apply to any portion of any such losses, claims, damages, liabilities and expenses to the extent it is found in a final judgment by a court of competent jurisdiction to have resulted primarily from the bad faith, gross negligence, willful misconduct or violation of law of any such Indemnified Party.. The Client agrees to use commercially reasonable best efforts to (i) include Marc Bilbao, Michael Yoshimura, and any other FTI personnel who assume officer or director positions with the Client or who perform Services hereunder, FTI and its agents, employees, officers, subcontractors, directors, joint venture partners and members, as insureds under the Client's directors and officers insurance; and (ii) unless it is unable to do so at a commercially reasonable cost, purchase a three-year directors and officers insurance "tail" or runoff policy (or such a policy for such shorter period as Client has the right to or is otherwise able to purchase) covering the period of FTI's service.  In connection with this engagement Client represents to FTI that Client hereby represents that (i) it has timely remitted and will continue to timely remit to the appropriate beneficiaries all employee source deductions, payroll and other taxes, benefits deductions, and contribution to employee benefit programs, and has timely collected and remitted sales and use and other similar taxes to appropriate collecting authorities and will continue timely to do so; (ii) there is no litigation or other proceeding pending, or to knowledge of Client, threatened (nor is Client aware of facts that could give rise to such), in each case that seeks or could give rise to personal liability of officers and directors of Client; and (iii) Client has been in continuing compliance with all applicable laws and regulations concerning the discharge, treatment, storage, transportation or use of hazardous materials and is aware of no facts or circumstances that could give rise to Client responsibility or liability under such laws and regulations.

6.3     **Limitation of liability –** You agree that no Indemnified Person shall be liable to you, or your successors, affiliates or assigns for damages in excess of the total amount of the fees paid to FTI under this Engagement Contract.  Without limiting the generality of the foregoing, in no event shall any Indemnified Person be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind.

You and the Company agree that no Indemnified Person shall have any liability as a result of your retention of FTI, the execution and delivery of this Engagement Contract, the provision of Services or other matters relating to or arising from this Engagement Contract, other than liabilities that shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of an Indemnified Person or Persons.  Without limiting the generality of the foregoing, in no event shall any Indemnified Person be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind.

**7.      Governing Law, Jurisdiction, WAIVER OF JURY TRIAL, and Compliance with Law**

7.1     **Governing Law** The Engagement Contract shall be governed by and interpreted in accordance with the laws of the State of New York, without giving effect to the choice of law provisions thereof.

7.2     Jurisdiction. - The United States District Court for the Southern District of New York and the appropriate Courts of the State of New York sitting in the Borough of Manhattan, City of New York shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the Engagement Contract and any matter arising from it. In a case under the Bankruptcy Code, the Bankrutpcty Court having jurisdiction over the Client's Bankruptcy case shall have exclusive jurisdictrion in relation to any claim, dispute or difference concerning the Engagement Contract and any matter arising form it. The parties submit to the jurisdiction of such Courts and irrevocably waive any right they may have to object to any action being brought in these Courts, to claim that the action has been brought in an inconvenient forum or to claim that those Courts do not have jurisdiction.

7.3     **WAIVER OF JURY TRIAL** – TO FACILITATE JUDICIAL RESOLUTION AND SAVE TIME AND EXPENSE, THE COMPANY AND FTI IRREVOCABLY AND UNCONDITIONALLY AGREE TO WAIVE A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE SERVICES OR THIS ENGAGEMENT CONTRACT.



7.4   **Compliance with Laws** - The Company agrees that it will comply with all anti-corruption, anti-money laundering, anti-bribery and other economic sanctions laws and regulations of the United States, United Kingdom, European Union and United Nations (collectively, the "ABC/AML/Sanction Laws") in connection with this Engagement.  The Company further agrees that it shall not, and it shall procure its employees not to, pay or cause other person(s) to pay FTI using any funds that would result in a violation of any of the ABC/AML/Sanction Laws by either Company or FTI, or otherwise take any action that would result in a violation of any of the ABC/AML/Sanction Laws by either Company or FTI. The Company shall promptly notify FTI in the event of any violation or failure to comply with ABC/AML/Sanction Laws in connection with this Engagement, or allegations relating thereto, by the Company or its directors, officers, employees or agents.

FTI CONSULTING, INC.



**<u>Confirmation of Standard Terms and Conditions</u>**

Subject to the terms and conditions of the Engagement Letter, we agree that FTI Consulting, Inc. is engaged upon the terms set forth in these Standard Terms and Conditions as outlined above.

**On behalf of Marlin-SL Midco 1, LLC, and its direct and indirect subsidiaries,**

By: _____

     Name: Greg Ruffini

     Title:  Co-Manager

Date: _04/11/2023_____

13



**EXHIBIT B**

**INITIAL SCHEDULE OF TEMPORARY STAFF**

| Staff | Level |
|---|---|
| Amir Agam | Senior Managing Director |
| Sydney Ahmed | Senior Consultant |



**<span style="color:red">TO BE ON FTI LETTERHEAD</span>**

**SCHEDULE A**

**STANDARD RELEASE LETTER**

**[Nonclient Recipient Letterhead]**

**[Date]**

FTI Consulting, Inc.

Dear Mr./Ms. _____:

_____ ("Client") has informed **[name of recipient]** that FTI Consulting, Inc. ("FTI") has performed certain procedures to assist Client in connection with the _____.  We understand that the work performed by FTI was performed in accordance with instructions provided by Client and was performed exclusively for Client's sole benefit and use.

Client has requested that FTI provide **[name of recipient]** access to the report of its findings dated **[date]**.  **[name of recipient]** acknowledges that this report was prepared at the direction of Client and may not include all procedures deemed necessary for the purposes of **[name of recipient]** and that certain findings and information may have been communicated to Client that are not reflected in the report.  **[name of recipient]** further acknowledges that (a) the report is being provided for informational purposes only; (b) the report shall not constitute, either expressly or impliedly, any representation or affirmation by FTI as to the accuracy, completeness and/or fairness of presentation of the Report or any statements or information contained therein; and (c) **[name of recipient]** will make any decisions based on its own investigation, due diligence and analysis, independent of, and without reliance on or reference to, the contents of the report or any other opinions or conclusions of FTI.

In consideration of FTI allowing **[name of recipient]** access to the report and, if requested by **[name of recipient]**, discussing the report, **[name of recipient]** agrees that it does not acquire any rights as a result of such access that it would not otherwise have had and acknowledges that FTI does not assume any duties or obligations to **[name of recipient]** in connection with such access.

**[name of recipient]** agrees to release FTI and its personnel from any claim by **[name of recipient]** that arises as a result of FTI permitting **[name of recipient]** access to the report.  Further, **[name of recipient]** agrees not to disclose or distribute the report, or information received, orally or in writing from FTI to any other parties without FTI's prior written consent.

Acknowledged by **[name of recipient]** representative:

By:  _____
       (Name of Company official)

Title:  _____

Date:  _____



SCHEDULE B

## FTI CONSULTING DATA PROTECTION SCHEDULE

This Data Protection Schedule ("**Schedule**") forms part of the contract for services to which it is an attachment (the "**Contract**") between the client party identified in the Contract (the "**Client**") and the relevant FTI Consulting group entity identified in the Contract ("**FTI**").

**1        Definitions**

1.1      In this Schedule, unless otherwise defined herein, all defined terms shall have the meaning set out in the Contract.

1.2      In this Schedule, the following terms shall have the meanings set out below:

1.2.1    "**Data Protection Laws**" means all legislation protecting the personal data of natural persons that is applicable to the processing of Personal Data under this Schedule, including (without limitation) the GDPR and any national legislation which supplements the GDPR, and the data protection laws of any other country, state or territory which apply to such processing**;**

1.2.2    "**EEA Standard Contractual Clauses**" means the Standard Contractual Clauses set out in the European Implementing Decision (EU) 2021/914 on standard contractual clauses for the transfer of personal data to third countries pursuant to Regulation (EU) 2016/679, as updated, amended, replaced or superseded from time to time by the European Commission;

1.2.3    "**GDPR**" means the General Data Protection Regulation (EU) 2016/679;

1.2.4    "**Restricted Transfer**" means a transfer of Personal Data from Client to FTI in circumstances where such transfer would be prohibited by Data Protection Laws in the absence of the EEA or UK Standard Contractual Clauses;

1.2.5    "**Standard Contractual Clauses**" means either the EEA or UK Standard Contractual Clauses, as applicable to a Restricted Transfer;

1.2.6    "**UK Standard Contractual Clauses**" means the standard contractual clauses for the transfer of personal data to Processors established in third countries which do not ensure an adequate level of protection as set out in Commission Decision 2010/87/EU, as updated, amended, replaced or superseded from time to time by the UK government; "**UK GDPR**" means the GDPR as transposed into United Kingdom national law by operation of section 3 of the European Union (Withdrawal) Act 2018 and as amended by the Data Protection, Privacy and Electronic Communications (Amendments etc.) (EU Exit) Regulations 2019; and

1.2.7    "**Personal Data**", "**Process**", "**Controller**", "**Processor**", "**Data Subject**", "**Supervisory Authority**" and "**Personal Data Breach**" shall have the meanings given to them in the Data Protection Laws.

**2        Controller Terms**

2.1      FTI and the Client will each act as separate and individual Controllers in relation to any Personal Data (including, without limitation, Personal Data relating to any of the Client's workers, FTI's workers, any litigation or arbitration opponent or customer or vendor or transaction partner) Processed by the Client or FTI to deliver the services set out under the Contract.

2.2      FTI and the Client will each comply with its own respective obligations under the Data Protection Laws in relation to their Processing of Personal Data under the Contract. In particular, the Client will ensure that any



disclosures of Personal Data to FTI are lawful, and, in each case where necessary under the Data Protection Laws, the Client has notified and secured the consent of the relevant Data Subjects.

2.3    FTI may appoint Processors as required to deliver the services, who will process the Personal Data on FTI's behalf and at FTI's direction. Further, FTI may disclose Personal Data to other Controllers:

2.3.1    where necessary to deliver the services (including, but without limitation, law firms, accountants, other third party experts and any member of FTI's group of companies); or

2.3.2    pursuant to a legally binding written request, an order or request of a court of competent jurisdiction or any governmental or regulatory authority or where disclosure is required by applicable law or regulation ("**Legal Process**").  In relation to any Legal Process, FTI shall assess the lawfulness of the request before responding, and shall take any steps required by Data Protection Laws to protect Personal Data prior to its disclosure (including, without limitation, with respect to data minimization and data security);

2.4    *In respect of any Restricted Transfer subject to the GDPR, the parties hereby enter into Module 1 of the EEA Standard Contractual Clauses (with Client as data exporter and FTI as data importer), which is hereby incorporated by reference into this Schedule and which shall come into effect upon the commencement of a Restricted Transfer.  The parties make the following selections for the purposes of Module 1:*

2.4.1    *Clause 7* – Docking clause *shall apply;*

2.4.2    *Clause 11(a)* – Redress *the optional language shall not apply;*

2.4.3    *Clause 13(a)* – Supervision

2.4.3.1    *Where Client is established in an EU Member State, the following shall apply: "The supervisory authority with responsibility for ensuring compliance by the data exporter with Regulation (EU) 2016/679 as regards the data transfer shall be the supervisory authority of the Member State in which Client is established or (if different) the lead supervisory authority of the Client in respect of a cross-border processing activity".* OR

2.4.3.2    *Where Client is not established in an EU Member State, but falls within the territorial scope of application of the GDPR in accordance with Article 3(2) and has appointed a representative pursuant to Article 27(1) of the GDPR the following shall apply: "*The supervisory authority of the Member State in which the representative within the meaning of Article 27(1) of Regulation (EU) 2016/679 is established, shall act as competent supervisory authority.*"* OR

2.4.3.3    *Where Client is not established in an EU Member State, but falls within the territorial scope of application of the GDPR in accordance with Article 3(2) without however having to appoint a representative the following shall apply: "*The supervisory authority of one of the Member States in which the data subjects whose personal data is transferred under these Clauses in relation to the



offering of goods or services to them, or whose behaviour is monitored, are located, as indicated in Annex I.C, shall act as competent supervisory authority.*"*

*2.4.4    Clause 17 – Governing law "Option 1" shall apply and the "Member State" shall be the Republic of Ireland;*

*2.4.5    Clause 18 – Choice of forum and jurisdiction the Member State shall be the Republic of Ireland;*

*2.4.6    Annex 1 – the data exporter is Client and the data importer is FTI (in each case as identified, including in relation to their places of establishment, in the Principal Agreement) and the description of transfer is deemed to be as described in Annex 1 to this Schedule;*

*2.4.7    Annex 2 – the technical and organizational security measures are deemed to be as described in Annex 2 to this Schedule; and*

*2.4.8    Annex 3 – not applicable.*

**2.5**    *In respect of any Restricted Transfer subject to the UK GDPR, the parties hereby enter into the UK Standard Contractual Clauses (with Client as data exporter and FTI as data importer), which are incorporated by reference into this Schedule and which shall come into effect upon the commencement of a Restricted Transfer. For the purposes of clause II h) of the UK Standard Contractual Clauses, the Parties shall be deemed to have selected option (iii).  Annex 2 to the UK Standard Contractual Clauses shall be deemed to be prepopulated with the relevant sections of the Annex to this Schedule.  If at any time the UK government approves the EEA Standard Contractual Clauses for use under the UK GDPR, the provisions of paragraph 2.4 shall apply in place of this paragraph 2.5 in respect of Restricted Transfers subject to the UK GDPR, subject to any modifications to the EEA Standard Contractual Clauses required by the UK GDPR (and subject to the governing law of the EEA Standard Contractual Clauses being English law).*

2.6    The Client acknowledges and agrees that certain Processors or Controllers engaged by FTI under paragraph 2.3 may be located in places that may require cross-border transfers of Personal Data. In respect of transfers by FTI to such Controllers or Processors, FTI will take steps in accordance with the Data Protection Laws to ensure an adequate level of protection for the Personal Data Processed by such Processors or Controllers. Where such a Controller or Processor notifies FTI that it may no longer be able to provide an adequate level of protection in accordance with Data Protection Laws, FTI shall independently assess the level of protection provided and, where necessary, shall take mitigating steps to improve the level of protection or, where this is not possible, terminate the transfer.

2.7    The Client acknowledges that FTI's email records are replicated onto a Microsoft 365 Cloud system in the United States of America and the Client hereby consents that any Personal Data that is provided to FTI by email will be replicated accordingly. To the extent that the Client wishes to transmit certain information or data to FTI and the Client objects to that data being replicated in accordance with this paragraph, the Client will use a communication or transmission method other than e-mail or will use an alternative e-mail system.



**SCHEDULE C**

## FTI CONSULTING CALIFORNIA DATA PROTECTION SCHEDULE

This California Data Protection Schedule ("Schedule") forms part of the contract for services to which it is an attachment (the "Contract") between the client party identified in the Contract (the "Client") and the relevant FTI Consulting group entity identified in the Contract ("FTI"). FTI will be functioning as a service provider.

1. Processing of Personal Information.
    In connection with FTI's provision of services to Client under the Contract, if FTI receives any personal information (as such term is defined under the California Consumer Privacy Act) from or on behalf of Customer, then FTI:

    (a) will only process such personal information for the purpose of providing the services;

    (b) will not retain, use, or disclose such personal information for any purpose other than to perform the services or outside of the direct business relationship between FTI and Client;

    (c) will not sell, rent, release, disclose, disseminate, make available, transfer or otherwise communicate such personal information to any third party for monetary or other valuable consideration; and

    (d) certifies that it understands the restrictions on its processing of such personal information as set forth in this sentence, and will comply with them.

FTI may disclose personal information to FTI's service providers in connection with such service providers providing services to FTI, and FTI may permit such service providers to process personal information as necessary for FTI to provide the services to Client.



### Annex 1: Description of Personal Data Processing

This Annex includes certain details of the Processing of Personal Data by FTI under the Principal Agreement.

**1. Subject matter and duration of the Processing of the Personal Data**

The subject matter and duration of the Processing of the Personal Data are set out in the Principal Agreement and this Schedule.

**2. The nature and purpose of the Processing of the Personal Data**

FTI is engaged to provide Services to Client which involve the Processing of Personal Data. The scope of the Services are set out in the Principal Agreement, and the Client Personal Data will be Processed by FTI for purposes determined by it, in connection with the delivery of those Services and compliance with the terms of the Principal Agreement, including this Addendum, as well as applicable laws.

**3. The types of the Personal Data to be Processed**

Client customer or employee information which may be collected in the course of delivering consulting and advisory services to Client, including name, title, gender, personal contact details (address, telephone number, email address), work address, work email, work telephone numbers, job title, and other types of Personal Data supplied by the Client to FTI pursuant to the Principal Agreement.

**4. The categories of Data Subject to whom the Personal Data relates**

The categories of Data Subjects are determined by the nature of the client engagement, the details of which are covered in the Principal Agreement.

**5. The obligations and rights of Client**

The obligations and rights of Client are set out in the Principal Agreement and this Schedule.

**6. Frequency of Restricted Transfers (where applicable):**

As necessary to deliver Services for the duration of the Principal Agreement.

**7. The period for which Personal Data subject to Restricted Transfers will be retained (where applicable):**

In accordance with FTI's data retention policies, copies of which are available upon request.



### Annex 2: Technical and Organizational Security Measures

FTI Consulting maintains the following technical and organizational security measures when processing Personal Data for its clients.

- Measures of pseudonymisation and encryption of personal data

When data at rest leaves our direct control (such as backup tapes, removable hard drives, etc.) the data is encrypted using AES 256-bit encryption. All laptops utilize full disk encryption. Data that is in transit over public circuits is encrypted in transit using SSL. FTI Consulting additionally deploys firewalls throughout its networks to allow and deny specific network traffic using key indicators such as source/destination address, source/destination port, etc.

- Measures for ensuring ongoing confidentiality, integrity, availability and resilience of processing systems and services Measures for ensuring the ability to restore the availability and access to personal data in a timely manner in the event of a physical or technical incident

FTI requires new employees/contractors to acknowledge receipt of the following policies including: Code of Ethics and Business Conduct, Anti-Corruption Policy,
Acceptable Use of Technology Resources, Confidentiality Agreement, Employee Handbook
Policy on Inside Information & Insider Trading, and Time Recording Policy.

FTI Consulting has a documented policy for business continuity and disaster recovery that has been approved by management, communicated properly and is maintained and reviewed. The general details are reflected in the FTI Consulting Information Security Policy. The recovery point objective exceeds 4 hours and the recovery time objective exceeds 24 hours.  The specific tools used for backups vary by region.

- Processes for regularly testing, assessing and evaluating the effectiveness of technical and organisational measures in order to ensure the security of the processing

FTI has access to all major vendor security bulletins and have controls over identifying, scheduling, testing, and deploying patches. The deployment time is 14 days for high and within 24 hours for critical/emergency patches.

FTI has controls over identification of vulnerabilities, risk ranking, reporting, and remediation.  This includes perimeter vulnerability scans that must be performed at least quarterly and semi-annual internal vulnerability scans that cover workstations, servers, and network devices.

FTI performs internal penetration test to identify flaws in the internal security controls that could allow an attacker to surreptitiously gain access to sensitive data and/or disrupt critical business systems.  The organization must also perform external network penetration test to identify potential vulnerabilities which could be exploited to gain access to systems and data or to establish a foothold into internal network from which to launch further attacks.

FT's cybersecurity team tracks the resolution of vulnerabilities. Vulnerabilities that are not resolved as part of patching cycles must be tracked on a vulnerability log or similar mechanism.

- Measures for user identification and authorization

FTI uses unique IDs and if generic IDs should be disabled unless there is an approved security exception.  FTI users authenticate through Active Directory (AD), SSO used when possible, and remote connection requires two factor authentication and leverages FTI's Corporate DUO two factor technology. Duo Security generates passcodes (similar to a PIN Code) to mobile devices for login and can receive push notifications for easy updates. Duo Security is integrated with OneLogin (our SSO platform) providing a unified authentication solution.

Privileged and remote access must include multi-factor authentication and secure mechanisms (e.g., TACACs+, RADIUS) must be used on all network devices.
FTI password complexity (i.e. characters, length), lockout settings, expiration settings meets the following requirements:



.    Contain both upper and lower case characters (e.g., a-z, A-Z)
·    Have digits and punctuation characters as well as letters e.g., 0-9,!@#$%^&*()_+|~-=\`{}[]:";"<>?,./)
·    Contains at least 12 characters for standards accounts and 15 characters in length for admin accounts
·    Must be changed at least every 90 days
·    Are not words in any language, slang, dialect, jargon, etc.
·    Are not based on Confidential Information, names of family, etc.
·    User accounts are locked after 10 unsuccessful logins. Account lockout for 30 mins. Reset after 30 mins.
·    Password history - 24 passwords remembered

Passwords are stored protected in an encrypted format.

- Measures for the protection of data during transmission and measures for the protection of data during storage

FTI has Data Loss Prevention (DLP) and extrusion prevention tools that restrict sending sensitive data over unsecure mail.  Anomalies that exceed the normal traffic patterns are noted and appropriate action is taken to address them.

FTI protects data in transmission which include the following acceptable methods:

- Email: Transport Layer Security ("TLS") Internet protocol, which provides security for all email transmissions over the public Internet may be setup with using opportunistic or mandatory TLS connections.  Only TLS 1.2 or TLS 1.3 is acceptable.

- "Mailbox to mailbox" encryption that secures email messages and electronic files (using 256-bit AES encryption).

- Secure FTP:  FTP utilizes TLS or SSH to allow us to share data with clients securely over the Internet.  Only TLS 1.2 or TLS 1.3 is acceptable.

- External Encrypted Drive:  Must use FIPS 140-2/AES 256-bit encryption or stronger.

- File Stores:  Matter/Engagement related files stored centrally on the network are secured so that only those explicitly authorized can access the files.

FTI stores data in an environment that is not internet facing and segregated from the demilitarized zone by a firewall. The data must be logically segregated from other client or corporate data. Different tools may be employed depending upon the nature and/or location of the work.

- Measures for ensuring physical security of locations at which personal data are processed

Specific physical security provisions vary depending on office location, however, as per the Information Security policy, access to company premises, including delivery and loading areas, must require badge access.  Badge access is managed by local facilities or ITG, who use a badge kiosk to produce access badges.  All badge issuances and updates require management approval.

- Measures for ensuring events logging

FTI logs activity which is stored for 7 years.  Data is logged at sufficient level (i.e. user ID, activity) and logging is enabled for the entire environment.  The logging must provide relevant information (i.e. authorized & unauthorized attempts, remote access). System event and audit logs should capture the following events as applicable:
- Authentication failures
- Software or service failures
- Logon and use of privileged IDs
- Database changes



- Adding/deleting users
- Password Changes
- Adding/deleting groups and/or users associated with groups
- Changing audit log configuration or disabling audit subsystem

FTI uses SecureWorks which provides a Security Incident and Event Management (SIEM). The foundation of the SIEM includes Red Cloak endpoint event logs analysis, which includes an industry-leading assessment of current and zero-day threats and vulnerabilities.

- Measures for ensuring system configuration, including default configuration Measures for internal IT and IT security governance and management

FTI has processes in place to confirm compliance with configuration standards.  This includes a process for newly created device (i.e., checklist), at least annual reviews and hardening, removal of unnecessary / insecure services, and alarms set for key events (i.e. change in security group, configuration).

- Measures for certification/assurance of processes and products

FTI holds the Certified Enterprise designation from Verizon Cybertrust and participates in their Security Management Program (SMP).  The SMP is a comprehensive security risk reduction and certification program that addresses all aspects of proactive information security, from network and system analysis to physical and policy inspection.  The cornerstone of SMP is the International Standards Organization (ISO) standard 27002.

As part of the Cybertrust Third Party assessment schedule, FTI Consulting's Global Cybersecurity and Privacy function undergoes the following reviews by the Verizon Security Certification organization:

- Policy Review — evaluates the documentation and inspects the contents of key security policies — Annually.
- Process and Procedure Validation — Annually.
- Physical Inspection — evaluates the implementation of security controls in the physical environment surrounding critical network infrastructure, including doors, HVAC, entry logs, power redundancy, etc. — Annually.
- External Risk Assessments (Network and System-level scans) — Quarterly identifies possible risk areas in an organization's external network infrastructure and assesses its consistency with key controls.
- Penetration testing (External and Internal – Network and System-level) is conducted by a separate third-party — Annually.

Individual business units may hold additional certifications or use tools that are supported by additional certifications.

- Measures for ensuring data minimisation

FTI only acquires data for the intended purpose by working with the client or business partner to ensure only the minimum amount of necessary data is obtained.

- Measures for ensuring data quality

FTI Consulting is dedicated to providing its clients with high quality services that meet our standards of excellence and integrity.  The quality of the work for each of our clients is monitored by the Senior Managing Directors responsible for each engagement along with the highly qualified colleagues in their practice teams and business segments.  On a broader level, FTI sets the tone for our global organization in our Code of Conduct (https://www.fticonsulting.com/~/media/Files/us-files/our-firm/guidelines/fti-code-of-conduct.pdf) which discusses our commitment to quality throughout, and in particular in our Statement of Values.

FTI takes into account the principle of purpose limitation, while making sure that the data is adequate, relevant and



not excessive for the legitimate purpose. FTI enables data subjects to exercise their rights, including the rights of access and, as appropriate, the rectification, erasure or blocking of Personal data and keep data accurate, and not retain it any longer than necessary.

- Measures for ensuring limited data retention

FTI has a records retention policy that ensures records are retained for required and necessary periods of time; providing that records which are no longer useful are properly destroyed; and providing that records to be retained are stored methodically and economically.  FTI uses their reasonable and best efforts to prevent the premature destruction of Records. The organization must have processes to return data upon end of contract and destroy data using appropriate mechanisms upon Department of Defense (DoD) and National Institute of Standards and Technology (NIST) standards for all data bearing devices.

- Measures for ensuring accountability

FTI has a defined process to resolve complaints about privacy and its collection or use of personal information in compliance with the EU-US Privacy Shield Principles.  FTI has measures in place to ensure complaints are resolved within 1 month.   Unless otherwise dictated by local law, the exact number of days to comply with a request varies, depending on the month in which the request was made and is calculated based on the day the request is received plus one (regardless of whether the day is a working day or not) until the corresponding calendar date in the next month.

- Measures for allowing data portability and ensuring erasure

FTI receives requested Personal Data directly or provide access to a tool which allows the requestor to extract the information themselves using a self-service type model.

The Personal Data requested is required to be provided in a format and structure which is commonly used and machine-readable. The following machine-readable formats:

- CSV: (Comma separated values) a format that stores tabular data (numbers and text) in plain-text form;
- PDF: (Portable Document Format) a file format used mainly to represent documents such that layout will stay the same independent of the system environment;
- XML: (eXtensible Markup Language) a markup language that defines a set of rules for encoding documents in a format that can be both human and machine readable;
- JSON: (JavaScript Object Notation) a machine-readable data format derived from the JavaScript language used for representing simple data structures and associative arrays; or
- HTML: (HyperText Markup Language) the main markup language for displaying web pages and other information in a web browser.

FTI has a data erasure process in place to track and manage responses, and, as necessary, provide updates to the relevant regulatory authority and/or input into management reports.  The organization must verify the identity of the data subject before disclosing any personal information.  The organization should only refuse to comply with an erasure request if it is "manifestly unfounded or excessive" or, alternatively may elect to charge a "reasonable fee." The response is in written communication together with the documents containing the proper erasure of data.





<u>CONFIDENTIAL</u>

May 15, 2023

Greg Ruffini
Lifesize, Inc.
216 W. Village Blvd, Suite 102
Laredo, TX 78041

**Re:  Amendment to Co-Chief Restructuring Officer Services for Lifesize, Inc. ("Amendment")**

Dear Mr. Ruffini:

The purpose of this letter is to amend certain terms of the engagement letter dated April 11, 2023 (the "Engagement Contract") under which FTI Consulting, Inc. ("FTI") has been retained by SL Midco 1, LLC, and certain of its direct and indirect subsidiaries (the "Client" or "Lifesize") to provide Chief Restructuring Officer services and certain temporary employees (the "Services").[1]

The scope of the Services is modified to add the following (the "Amended Services"):
- Assist the Client in planning communications strategies and tactics in preparation for a potential filing under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case").
- Prepare external communications and press releases as they relate to the Bankruptcy Case .
- Prepare internal employee communications regarding the Bankruptcy Case.

For the Amended Services, the Client agrees to pay FTI a total sum of $100,000, as follows:
- Upon execution of this Amendment, FTI will draw $25,000 from its Initial Cash on Account.
- Concurrent with the Monthly Advisory Fee paid for June 2023, an additional prepaid non-refundable advisory fee of $50,000. For the avoidance of doubt, the total Monthly Advisory Fee for the Services and Amended Services in June 2023 will be $300,000.
- Upon termination of the Engagement Contract and the Amended Agreement, FTI will draw the remaining $25,000 from its Initial Cash on Account.

An amended schedule of Hourly Temporary Staff (as defined in the Engagement Contract) is set out on Exhibit "A".

All other terms and conditions of the Engagement Contract remain in full force and effect.

Please acknowledge your accepteance of the amended terms of the Engagement Contract by signing the confirmation below and returning a copy to us electronically.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Engagement Contract.

ACCEPTED AND AGREED this 15th day of May, 2023.

On behalf of Marlin-SL Midco 1, LLC and its direct and indirect subsidiaries,

By: _____

    Name: Greg Ruffini
    Title: Director

Date:_____



## EXHIBIT A

## AMENDED SCHEDULE OF TEMPORARY STAFF

| Staff | Level |
|---|---|
| Amir Agam | Senior Managing Director |
| Rachel Chesley | Senior Managing Director |
| Jennifer Mercer | Managing Director |
| McKay Jacobson | Senior Director |
| Sydney Ahmed | Senior Consultant |
| Diana Baldo | Senior Consultant |
| Samantha Hardey | Consultant |

